No. 14-1387

_____

## UNITED STATES COURT OF APPEALS
## FOR THE FORTH CIRCUIT

_____

Paula A. Piehl, Individually and as Personal Representative
of the Estate of Martin Piehl, and Forrest Piehl, Individually
Plaintiff – Appellant

v.

Narayan P. Saheta, M.D.
Defendant – Appellee

_____

On Appeal from the U.S. District Court for the District of Maryland

_____

## BRIEF OF APPELLANT

Henry L. Belsky, Esq.
Mitchell E. Rosensweig, Esq.
Schlachman, Belsky & Weiner, P.A.
300 East Lombard Street, Suite 1100
Baltimore, Maryland 21202
410-685-2022
410-783-4771(fax)
hbelsky@sbwlaw.com
*Counsel for Appellant*

Frederick W. Goundry, III, Esq.
Matthew H. Fogelson, Esq.
Varner & Goundry, P.A.
121 East Patrick Street
Frederick, Maryland 21701
301-631-1800
301-631-9234(fax)
fgoundry@vglaw.org
*Counsel for Appellee*

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** … … … … … … … … … … … … … … … … … … …iii

**JURISDICTIONAL STATEMENT** … … … … … … … … … … … … … … …1

**STATEMENT OF ISSUES** … … … … … … … … … … … … … … … … … …2

**STATEMENT OF CASE** … … … … … … … … … … … … … … … … … … … …3

**SUMMARY OF ARGUMENT** … … … … … … … … … … … … … … … … …8

**ARGUMENT** … … … … … … … … … … … … … … … … … … … … … …10

    **I.**     **The Standard of Review is an Abuse of Discretion** … … … … … …10

    **II.**     **The Court Erred in its Treatment on the Issue of Contributory Negligence and its Rulings were Fundamentally Unfair to Appellant and Misled and/or Confused the Jury** … … … … … … … …10

    **III.**     **The Court Erred in Allowing Appellee's Counsel to Ask Dr. Arden on *Voir Dire* Examination about Collateral Matters that were Highy Prejudicial and Irrelevant to Dr. Arden's Qualifications as an Expert Witness** … … … … … … … … … … …19

    **IV.**     **The Court Erred in Rejecting Appellant's Proposed Jury Instructions Nos. 3, 5, 6, 10, 11, & 13** … … … … … … … … … … …22

**CONCLUSION** … … … … … … … … … … … … … … … … … … … … … …27

**REQUEST FOR ORAL ARGUMENT** … … … … … … … … … … … … …27

**SIGNATURE OF COUNSEL** … … … … … … … … … … … … … … … …27

**CERTIFICATE OF COMPLIANCE**

**CERTIFICATE OF SERVICE**

## TABLE OF AUTHORITIES

**Cases**

Collins v. Nat'l R.R. Passenger Corp., 417 Md. 217, 9 A.3d 56 (2010)... ... ... ... ..22

Gen. Elec. Co. v. Joiner, 522 U.S. 136, 118 S. Ct. 512 (1997)... ... ... ... ... ... ...10

Goldman v. Johnson Motor Lines, Inc., 192 Md. 24, 63 A.2d 622 (1949)... ... ......13

Gutterman v. Biggs, 249 Md. 421, 240 A.2d 260 (1968)... ... ... ... ... ... ... ... ....13

Hannemann v. Boyson, 282 Wis.2d 664, 698 N.W.2d 714 (2005)... ... ... ... ... ...25

Sard v. Hardy, 281 Md. 432, 379 A.2d 1014 (1977)... ... ... ... ... ... ... ....12, 24-25

Schloendorff v. Society of N.Y. Hosp., 211 N.Y. 125, 105 N.E. 92 (1914)..........12

Yonce v. SmithKline Beecham Clinical Labs., Inc., 111 Md. App. 124, 680 A.2d

569 (1996)....................................................................................................23-24


**Statutes**

28 U.S.C. § 1291 ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...1

28 U.S.C. § 1332 ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...1


**Other Authorities**

Fed. R. App. P. 34(a)... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...27

Fed. R. Evid. 402 ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... .20

Fed. R. Evid. 403 ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... .22

Fed. R. Evid. 702 ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... .19

MPJI – Cv 10:3 ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... .26

MPJI – Cv 19:3 ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ..22

## JURISDICTIONAL STATEMENT

The United States District Court of Maryland had jurisdiction to hear this case pursuant to 28 U.S.C. § 1332.

Appellant, Paula A. Piehl, is the wife of Martin A. Piehl, and was appointed *Personal Representative* of the Estate of Martin A. Piehl by the Mineral County Commission for the State of West Virginia on March 29, 2010. Paula A. Piehl and Martin A. Piehl were at all times relevant to this action, residents of Burlington, West Virginia.

Appellant, Forrest Piehl, is the son of Martin A. Piehl and was at all times relevant to this action a resident of Michigan.

Appellee, healthcare provider Narayan P. Saheta, M.D., was at all times relevant to this action a cardiologist licensed in the State of Maryland.

The amount in controversy is in excess of $75,000.00.

This Court has jurisdiction to hear appeals from final judgments and orders of district courts pursuant to 28 U.S.C. § 1291.

The jury returned a verdict for the appellee on April 2, 2014. A final order of judgment was entered on April 2, 2014. Appellant filed a timely Notice of Appeal on April 17, 2014. This appeal is from a final order of judgment that disposes of all of the parties' claims in the case before the district court.

1

## STATEMENT OF ISSUES

1. Were the District Court's rulings on the issue of contributory negligence fundamentally unfair to Appellant and misled and/or confused the jury?

2. Did the District Court err by permitting Appellee's counsel to ask Dr. Arden on *voir dire* examination about collateral matters that were highly prejudicial and irrelevant to Dr. Arden's qualifications as an expert witness?

3. Did the District Court err in rejecting Appellant's proposed Jury Instructions Nos. 3, 5, 6, 10, 11, and 13?

## STATEMENT OF CASE

On March 12, 2003, Martin A. Piehl, Ph.D. (hereinafter "Mr. Piehl"), who had a long history of cardiac disease, began seeing Dr. Narayan P. Saheta (hereinafter "Dr. Saheta"), a cardiologist, to treat and monitor his cardiac conditions. J.A. 186:23-187:4. At his initial office visit, Dr. Saheta determined that Mr. Piehl had severely depressed left ventricular systolic function.[1] J.A. 111-114. At that time, Dr. Saheta felt that Toprol XL[2] was adequately protecting Mr. Piehl from his heart condition. J.A. 111-114. Dr. Saheta thought, however, that depending on the type of arrhythmia[3] detected on an event monitor, Mr. Piehl might require Amiodarone therapy[4] (sometimes referred to as Cordarone). J.A. 111-114.

Dr. Saheta continued to provide care for Mr. Piehl. On February 15, 2008, Dr. Saheta noted the results of a Holter Monitor reading showing a 4-beat run of ventricular tachycardia and based on that reading, he initiated Amiodarone therapy. J.A. 197:1-17. Amiodarone therapy may cause a clinical syndrome consistent with

---

[1] Severely depressed left ventricular systolic function is where the heart is unable to pump as much blood as a normal heart would.
[2] Toprol XL is a medicine know as a beta blocker.
[3] An arrhythmia is an irregular or loss of rhythm of the heart which could be fatal.
[4] Amiodarone is an antiarrhythmic drug.

3

Pulmonary Toxicity.[5] J.A. 208:17-209:16. The drug's insert, as well as literature, indicate that upon initiating Amiodarone therapy, a baseline chest x-ray and pulmonary function test, including diffusion capacity[6] should be performed. J.A. 208:17-209:25. Also, the patient should return for a history, physical exam, and chest x-ray every four to six months. J.A. 313:2-7. Dr. Saheta did not perform a pulmonary-function test[7] or take a chest x-ray prior to initiating and subsequently after initiating Amiodarone therapy for Mr. Piehl. J.A. 197:12-198:12; 199:17-200:7; 203:9-21.

On March 23, 2009, over one year after Dr. Saheta initiated Amiodarone therapy, Mr. Piehl visited an Urgent Care, complaining of having had a fever for several days, chest congestion, and shortness of breath. J.A. 128-130. The physicians at Urgent Care conducted a chest x-ray, which revealed severe chronic interstitial fibrosis[8] of the lungs, also a common pathology[9] of Amiodarone toxicity. J.A. 131.

---

[5] Pulmonary Toxicity is a side effect of taking the drug Amiodarone and develops in the lungs.

[6] Diffusion capacity is part of a pulmonary function test that is done to determine the overall ability of the lung to transport gas in and out of the blood.

[7] A pulmonary-function test is a test used to evaluate the condition of the respiratory system.

[8] Severe chronic interstitial fibrosis is a term used to indicate that the interstitium of the lung has suffered irreparable damage in the form of fibrosing or hardening of the tissue of the lungs.

[9] Pathology is the study of nature and causes of diseases.

4

On April 30, 2009, Mr. Piehl had an office visit with Dr. Saheta. J.A. 200:11-201:4. Dr. Saheta's Consultation Note from that visit indicates that he was aware that Mr. Piehl was hospitalized in March of 2009 for pneumonia. J.A. 200:11-202:23. Dr. Saheta noted:

> "...one wonders whether his recent admission with pneumonia was in fact secondary to infiltrates originating from Amiodarone pulmonary toxicity...."

J.A. 193:22-25.

On January 28, 2010, Mr. Piehl was seen again at Urgent Care, at which time he complained of a fever and chest congestion. J.A. 123-124. By January 30, 2010, Mr. Piehl presented to Potomac Valley Hospital's Emergency Room with complaints of chest heaviness and fever. J.A. 132. Mr. Piehl was immediately transferred to Western Maryland Regional Medical Center, where he was admitted after he developed acute onset of increased dyspnea[10] associated with a sensation of chest tightness. J.A. 133-135. On January 31, 2010, while at Western Maryland Regional Medical Center, Dr. Saheta evaluated Mr. Piehl. J.A. 204:9-24. This was the first time that Dr. Saheta had seen Mr. Piehl since he suspected Amiodarone toxicity on April 30, 2009. J.A. 204:3-24. Once again, Dr. Saheta noted that Mr. Piehl's current condition could be Amiodarone related pneumonitis.[11] J.A. 136-

---

[10] Dyspnea is a term used for labored or difficulty breathing.
[11] Pneumonitis is inflammation of the lung, usually due to hypersensitivity.

5

138. As a result, Dr. Saheta discontinued Mr. Piehl's Amiodarone therapy for the first time since its initiation on February 15, 2008. J.A. 136-138.

During Mr. Piehl's course of treatment at Western Maryland Regional Medical Center, his condition rapidly deteriorated. J.A. 252:22-253:4. As a result, Mr. Piehl was transferred to the University of Pittsburgh Medical Center on February 11, 2010. J.A. 254:11-13. At the University of Pittsburgh Medical Center, treatment for bilateral infiltrates continued. J.A. 141-142. However, it was noted that the infiltrates were progressing to involve both lungs. J.A. 139-140. On March 8, 2010, a VATS (Video Assisted Thoracic Surgery) biopsy of Mr. Piehl's lungs was performed to determine the etiology of the infiltrates. J.A. 143-144. The biopsy revealed cryptogenic organizing pneumonia.[12] J.A. 145. Unfortunately, despite the treatment rendered to Mr. Piehl, he passed away on March 12, 2010. J.A. 226:4-21. Mr. Piehl's death certificate indicated that his death was caused by multiorgan system failure and cryptogenic organizing pneumonia. J.A. 146.

Following the death of Mr. Piehl, Appellant, Paula A. Piehl, the wife of Mr. Piehl, was appointed *Personal Representative* of the Estate of Martin A. Piehl by the Mineral County Commission for the State of West Virginia on March 29, 2010.

---

[12] Cryptogenic organizing pneumonia is a rare idiopathic lung condition in which the small airways and air exchange sac (alveoli) become inflamed with connective tissue.

6

On April 30, 2012, Paula Piehl, as the wife of many years and personal representative of the estate of Martin Piehl, and Forrest Piehl, individually, filed a three-count medical malpractice statement of claim before the Maryland Healthcare Alternative Dispute Resolution Office alleging violations of the standard of care by Dr. Saheta.

Count I was a survival action brought by Paula A. Piehl as personal representative of the estate of Martin A. Piehl. Count II was a wrongful death action brought on behalf of Paula Piehl individually. Count III was a wrongful death action brought on behalf of Forrest Piehl, individually.

After the certificates of qualified experts were filed in the Maryland Healthcare Alternative Dispute Resolution Office, the case was refiled in the United States District Court of Maryland, Northern Division on January 7, 2013.

A final order of judgment was entered on April 2, 2014. Appellant filed a timely Notice of Appeal on April 17, 2014.

## SUMMARY OF ARGUMENT

In Opening Statements, Appellee's counsel was permitted to discuss the issue of contributory negligence over Appellant's objection. Appellee's counsel stated, among other things:

> "Contributory negligence is a doctrine under Maryland law that if Mr. Piehl was contributorily negligent in refusing to have a defibrillator and refusing to have medical treatment in general, he cannot be awarded damages, nor can his estate nor can his family be awarded damages."

J.A. 177:9-14.

Throughout the testimony, almost every expert for Appellee said that the defibrillator was the appropriate modality of treatment and that Amiodarone was only a second choice.

The deceased, Mr. Piehl, chose Amiodarone as his modality of treatment for his possible arrhythmia. According to Appellant, Mr. Piehl died of a pulmonary event caused by Amiodarone Toxicity because he was not properly monitored by Dr. Saheta while on the drug, and did not die by an arrhythmia.

Although the court would not give an instruction on contributory negligence, it forbade Appellant's counsel to argue the issue of contributory negligence was not relevant; leaving the issue, brought up in opening statements by Appellee's counsel and still on the table as far as the jury was concerned, unanswered.

8

Further, Dr. Arden, an anatomic and forensic pathologist, was offered as an expert by Appellant. Over objection by Appellant's counsel, Appellee's counsel was permitted during *voir dire* examination to ask about irrelevant material that was highly prejudicial and did not go to his qualifications or credibility.

Lastly, the court refused several appropriate jury instructions which were accurate statements of the law and relevant to this case.

All of the court's errors taken together constitute an abuse of discretion.

<u>**ARGUMENT**</u>

I.    <u>**STANDARD OF REVIEW IS AN ABUSE OF DISCRETION**</u>

This Court should apply an "abuse of discretion" standard when reviewing this case. The United States Supreme Court held that "abuse of discretion" is the proper standard of review of a district court's evidentiary rulings and procedural rulings. <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. 136, 141, 118 S. Ct. 512, 517 (1997).

II.    <u>**THE COURT ERRED IN ITS TREATMENT ON THE ISSUE OF CONTRIBUTORY NEGLIGENCE AND ITS RULINGS WERE FUNDAMENTALLY UNFAIR TO APPELLANT AND MISLED AND/OR CONFUSED THE JURY**</u>

In the Opening Statement of the Appellee, the theory of contributory negligence, over objection, was introduced to the jury.  J.A. 176:22- 177:23.  This improper discussion of contributory negligence was the first of many, and caused irreparable prejudice to the Appellant.

Appellee, Dr. Saheta, diagnosed Mr. Piehl with a cardiac condition, and in the management of his care made several treatment options available, which included the administration of the drug Amiodarone or the surgical implantation of a defibrillator. J.A. 189:4-21.  Mr. Piehl elected to proceed with the administration of Amiodarone in order to determine whether this drug would alleviate his cardiac symptoms.

10

The cornerstone of the Appellee's case was that Mr. Piehl was contributorily negligent for not allowing Dr. Saheta to implant a defibrillator into his chest so as to protect him from sudden death syndrome. Throughout the trial, Appellee's counsel continuously revisited the issue of Mr. Piehl's refusal to get an implantable defibrillator, and Mr. Piehl's choice of Amiodarone for treatment of his condition. See J.A. 154:22-156:6; 166:18-170:5; 280:22-288:15; 289:19-290:22; 291:12-18; 293:10-295:21; 303:13-22; 328:10-25. Mr. Piehl did not die of sudden death syndrome, but died of a pulmonary event (J.A. 226:4-21), which the Appellant believes was a result of the drug Amiodarone and as a result of Dr. Saheta's negligence in not properly monitoring Mr. Piehl once he prescribed him the drug.

The drug Amiodarone is an appropriate drug for the treatment of ventricular arrhythmia, the condition Dr. Saheta was treating Mr. Piehl for; however, the drug carries a risk of causing a patient taking it to develop Amiodarone toxicity, a serious condition which can lead to death. J.A. 205:20-210:4. The literature, as well as the manufacturer's insert, recognizes this risk and recommends that a pulmonary function test and a cardiac x-ray be performed so as to establish a baseline so if a change occurs, the drug can be immediately stopped. J.A. 208:17-209:25. If caught early, the condition is reversible.

It is well established under Maryland jurisprudence that a patient has a right to be informed of the treatment options available for a condition, and to make an

informed decision concerning which treatment option they select to undergo.

When a patient elects a specific treatment option as opposed to another, the non-selection of an alternative therapy does not constitute contributory negligence.

> The patient has the right to select his modality of treatment.

> "The fountainhead of the doctrine of informed consent is the patient's right to exercise control over his own body, at least when undergoing elective surgery, by deciding for himself whether or not to submit to the particular therapy. As Judge Cardozo said for the New York Court of Appeals in Schoendorff v. Society of N. Y. Hosp., 211 N.Y. 125, 105 N.E. 92, 93 (1914), '(e)very human being of adult years and sound mind has a right to determine what shall be done with his own body.'"

Sard v. Hardy, 281 Md. 432, 439, 379 A.2d 1014, 1019-20 (1977).

In this case, Mr. Piehl complained to the Appellee, Dr. Saheta, about a flutter in his chest. J.A. 188:1-12. Dr. Saheta suggested the defibrillator, but in the alternative prescribed Amiodarone. J.A. 190:20-25. Mr. Piehl took the Amiodarone and the flutter went away. It certainly was reasonable, and not negligent, for Mr. Piehl to select a pill to solve his problem as opposed to an invasive surgery.

Once the Appellee prescribed the Amiodarone, it was incumbent upon Dr. Saheta to do so in a non-negligent manner. Whether or not Mr. Piehl would have died of an arrhythmia event we will never know. What we do know is that he died of a pulmonary event which, according to Appellant's experts, was caused by Amiodarone. J.A. 205:17-206:24. If his Amiodarone treatment was properly

12

monitored or if Mr. Piehl had been taken off the drug on April 9, 2010, the date Dr.
Saheta became aware of a previous pulmonary event, Mr. Piehl would not have
died.

In answering the question why Mr. Piehl's refusal to have a defibrillator
implanted is not contributory negligence, and why it should have been known to
the district court judge at the time of Opening Statements, we must look at what
Appellant would call Hornbook (basic) law of Maryland related to contributory
negligence. The court obviously recognized this basic law when it refused to grant
Appellee's jury instruction on the issue.

> "Although contributory negligence is ordinarily for the jury, unless there be
> some evidence of negligence of the plaintiff contributing to the happening of
> the accident beyond a mere scintilla, or evidence from which negligence
> may be legally inferred by reasonable persons, there is nothing which
> justifies the submission of plaintiff's negligence to the jury."

Gutterman v. Biggs, 249 Md. 421, 424, 240 A.2d 260, 262 (1968) (quoting

Goldman v. Johnson Motor Lines, Inc., 192 Md. 24, 31, 63 A.2d 622, 626 (1949)).

In this case it was the Appellee's theory that Appellant was contributorily
negligent in electing not to have a defibrillator implanted in his body. Appellee
stated in his opening:

> "Contributory negligence is a doctrine under Maryland law that if Mr. Piehl
> was contributorily negligent in refusing to have a defibrillator and refusing
> to have medical treatment in general, he cannot be awarded damages, nor
> can his estate nor can his family be awarded damages. Any amount of

13

contributory negligence is a complete bar, even one percent contributory
negligence is a complete bar to recovery."

J.A. 177:9-16.

This theme of contributory negligence was carried out throughout the trial,

by various expert testimony and continued even through closing when Appellee

said:

> "Some of our expert witnesses indicated well, you know, that's [a patient's]
> choice. That may be one's choice to not have a medical device, but then you
> have to live with the consequences, and you cannot then blame the doctor if
> you die a sudden death. You can't expect well, okay, I'm going to refuse this
> defibrillator, and then if I have an arrhythmia and die, well, you can't then
> hold the doctor responsible for that."

J.A. 328:10-18.

What Appellee wanted the court below to do is to take away Mr. Piehl's

right to choose his modality of treatment. In the end, the court recognized that this

was not a case of contributory negligence by refusing Appellee's request for an

instruction on the issue, but the court never explained to the jury it was not an issue

and further, would not permit Appellant's counsel the ability to discuss the issue.

This left the issue on the table, unrefuted, for the jury to consider.

The overwhelming prejudice of the notion of contributory negligence cannot

be underestimated. This was a theory that permeated the entirety of the trial. It

was overtly and emphatically stated in Appellee's Opening and throughout the

course of Appellee's experts' testimony. It was underscored and reiterated stealthy

in Appellee's Closing Argument.  The following instances represent a majority of the areas where the issue of implanting a defibrillator over taking Amiodarone was discussed during the trial.[13]

In Appellee's Opening Statement the issue of the defibrillator was extensively discussed.  Appellee first stated that Dr. Saheta recommended that Mr. Piehl have a defibrillator implanted, and that because Mr. Piehl refused this option, he recommended Amiodarone as a "second choice". J.A. 154:22-156:6.  Appellee argued but for Mr. Piehl refusing the defibrillator, he would not have been on Amiodarone. J.A. 54:22-156:6.  Then, Appellee began explaining why a defibrillator was necessary in this case and again that because Mr. Piehl refused to have one implanted, Dr. Saheta put him on Amiodarone as a backup for not having a defibrillator. J.A. 166:18-170:5.  On J.A. 176:22-177:23, Appellee introduced the doctrine of contributory negligence as a defense to its case, and over Appellant's objection, the court allowed Appellee to argue this issue to the jury.  Over Appellant's objection, the court allowed Appellee to state the following:

> "Contributory negligence is a doctrine under Maryland law that if Mr. Piehl was contributorily negligent in refusing to have a defibrillator and refusing to have medical treatment in general, he cannot be awarded damages, nor can his estate nor can his family be awarded damages. Any amount of contributory negligence is a complete bar, even one percent contributory negligence is a complete bar to recovery."

---

[13] For the purpose of trial, various terms were synonymous with defibrillator including the terms pacemaker, a device, an ICD, an AICD, and a PCD.

15

J.A. 177:9-16.

After the court allowed Appellee to introduce to the jury the defense of contributory negligence, Appellee called expert after expert to testify in regards to refusing a defibrillator. First, Appellee called to the stand Dr. Philip Buescher, a pulmonary and critical care physician. J.A. 228:12-24. Dr. Buescher testified extensively about the necessity of a defibrillator because Mr. Piehl was at risk for sudden death. J.A. 230:17-238:25. Dr. Buescher testified that the standard of practice was to start Mr. Piehl on Amiodarone while he was still deciding about the defibrillator, and then Dr. Saheta could always stop the drug if Mr. Piehl agreed to have the defibrillator. J.A. 241:15-24. Dr. Buescher repeatedly referred to Amiodarone as a second choice to having a defibrillator. J.A. 243:11-25.

Next, Appellee called Dr. Edward V. Platia, a cardiologist, to the stand to testify to his knowledge and experience of recommending and implanting defibrillators. J.A. 271:10-272:4. Appellee takes Dr. Platia through each time Dr. Saheta recommended a defibrillator. J.A. 280:22-288:15; 289:19-290:22; 291:12-18; 293:10-295:21. Further, Dr. Platia testified that Mr. Piehl was "reticent, reluctant, [and] adamant" about not getting a defibrillator, so the "next best thing" was to put him on Amiodarone. J.A. 303:13-22. Dr. Platia repeatedly testified that the defibrillator was the preferred method of therapy. J.A. 305:5-306:23; 311:2-8.

Lastly, Appellee recalled Dr. Saheta to the stand. Dr. Saheta testified to his discussions with Mr. and Mrs. Piehl on recommending the defibrillator. J.A. 314:18-22; 315:19-316:6; 316: 25-317:5.  Dr. Saheta testified that Amiodarone was subordinate to the device implantation, and that the defibrillator was not an alternative to Amiodarone, it was the number one option. J.A. 318:23-319:23.

At the close of all evidence, Appellee was given the opportunity to again argue contributory negligence on closing, under the guise of causation.  Appellee referred to Dr. Saheta's repeated recommendations for a defibrillator and Mr. Piehl's continual refusal of one. J.A. 328:4-25; 329:7-10; 337:25-339:5.

> "Then we know that Dr. Saheta repeatedly recommended defibrillator implantation for Mr. Piehl. There were multiple mentions, at least five office notes, plus two other documents, where PCD is recommended are stated in Dr. Saheta's chart. Mr. Piehl simply did not want to have a defibrillator. Some of our expert witnesses indicated well, you know, that's [a patient's] choice. That may be one's choice to not have a medical device, but then you have to live with the consequences, and you cannot then blame the doctor if you die a sudden death. You can't expect well, okay, I'm going to refuse this defibrillator, and then if I have an arrhythmia and die, well, you can't then hold the doctor responsible for that."

J.A. 328:4-18.  Although the words "contributory negligence" were never mentioned in Appellee's Closing Argument, they were implicit in Appellee's statements, thus leaving the jury to believe contributory negligence was still an issue in the case.

17

Appellee reiterated on closing Dr. Platia's testimony on the implantation of

defibrillators as well as Dr. Buescher's testimony.  Appellee stated:

> "[o]bviously, Dr. Platia indicated that he would prefer to have a patient have
> the defibrillator, but there are some patients who won't have it, and so you
> have a backup."

J.A. 335:3-20.  Appellee held Dr. Platia out to be a cardiologist,

> "since the beginning of the defibrillator process … [h]is whole specialty is
> the implantation of the defibrillator … ."

J.A. 333:1-11.

The court allowed Appellee on closing to erroneously mislead the jury as to

what Mr. Piehl died of.  Appellee argued Mr. Piehl was at significant risk for

sudden death and without the defibrillator he was at risk of dying unprotected. J.A.

340:16-22.  Appellee stated if Mr. Piehl did not have the defibrillator, the

alternatives were either Amiodarone, or run the risk of sudden death. J.A. 353:7-

14; 354:8-11.  Thus without actually coming out and saying the words

"contributory negligence", Appellee was allowed to argue Mr. Piehl was at fault

for his own death.

On the contrary, when Appellant attempted on rebuttal to address

contributory negligence, the court denied Appellant such opportunity.  Appellant

began his rebuttal stating:

> "Mr. Goundry spent a lot of time speaking about defibrillators. Mr. Goundry
> told you in his opening statement that there is this concept in law about

contributory negligence, and that my client was guilty of contributory negligence one percent. I remember the word, one percent. You will get no instruction –"

J.A. 360:14-19. Wherefore at that time, Appellant was cut off by the court in

sustaining Appellee's objection to mentioning contributory negligence, stating it

was not an issue. J.A. 360:12-23.

## III.    THE COURT ERRED IN ALLOWING APPELLEE'S COUNSEL TO ASK DR. ARDEN ON *VOIR DIRE* EXAMINATION ABOUT COLLATERAL MATTERS THAT WERE HIGHY PREJUDICIAL AND IRRELEVANT TO DR. ARDEN'S QUALIFICATIONS AS AN EXPERT WITNESS

Expert testimony is crucial in a medical malpractice case for several reasons.

The credibility of an expert witness can make or break a Plaintiff's case because

the Plaintiff carries the burden of proof. Damaging character evidence of an expert

witness can ruin the expert's credibility in the eyes of the jury, and if the jury does

not think the expert is credible, they could easily not believe any of his testimony

regardless of whether his opinions are truthful. Dr. Arden was offered, pursuant to

the Federal Rules of Evidence, as an expert in anatomic and forensic pathology.

Fed. R. Evid. 702. The court in this case erred by allowing Appellee's counsel,

while questioning Dr. Arden as to his qualifications, to introduce collateral matters

that were unduly prejudicial to Dr. Arden, and were furthermore irrelevant to his

19

qualifications as an expert witness and not offered to show any bias on Dr. Arden's part.

Under the Federal Rules of Evidence, "irrelevant evidence is not admissible." Fed. R. Evid. 402. The court should have precluded Appellee from introducing evidence of a report by the Office of Inspector General regarding the running of Washington D.C.'s Medical Examiner's Office. In addition, the court should have precluded the fact that Dr. Arden resigned from his position shortly after the report came out. However, the court overruled Appellant's objection to the introduction of this report. J.A. 215:4-9; 220:16-17. The report regarded poor management. Appellee admitted that he was "... focused on his performance in the management of that office." J.A. 216:24-217:2. Nothing in the report was relevant to Dr. Arden's qualifications as an anatomic and forensic pathologist, and nothing in the report went to his credibility or bias. Therefore, the court should have precluded introduction of this collateral matter, which was highly damaging to Dr. Arden's testimony.

Appellant recognizes that this Court generally gives great discretion to the trial judge on issues such as this; however, both the importance of this testimony and the manner in which Appellant's counsel and the lower court were blindsided, should weigh heavily in favor of exclusion. Dr. Arden was the Appellant's chief

expert on causation. The Appellant was relying on Dr. Arden's testimony to show

the jury that Mr. Piehl died of Amiodarone toxicity.

Both Appellant's counsel and the court were not forewarned that Appellee

planned to introduce this report. J.A. 215:4-24.

>MR. BELSKY: I don't know where this goes as far as qualifications are concerned. I don't know what this report says, but I don't think it goes to qualifications. I'd like to be enlightened on it.

>MR. GOUNDRY: Certainly it goes to his qualifications.

>MR. BELSKY: I don't know that. He did not exchange that with me. It's another one of these blind-side situations.

>MR. GOUNDRY: It's on the internet.

>THE COURT: You've never seen this?

>MR. BELSKY: I've never seen it, no.

J.A. 215:14-24.

>THE COURT: First of all, I have a concern about this document in regard to my inquiry before we left the courtroom last night, which was were there any evidentiary issues that might come up tomorrow that might be a problem. This is obviously one of those things that should have been discussed at that point.

J.A. 217:17-22.

Even if the court found that this information was relevant, it should have

been excluded in that its prejudicial effect far outweighed what if any probative

value a jury could have gleaned from its admission.

"The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

Fed. R. Evid. 403.

## IV.    THE COURT ERRED IN REJECTING APPELLANT'S PROPOSED JURY INSTRUCTIONS NOS. 3, 5, 6, 10, 11, & 13.

Appellant requested several appropriate jury instructions to which the lower

court erroneously rejected. J.A. 371:7-375:10.  In Maryland:

"litigants are entitled to have their theory of the case presented to the jury, provided the theory is a correct exposition of the law and is supported by the evidence."

Collins v. Nat'l R.R. Passenger Corp., 417 Md. 217, 229, 9 A.3d 56, 63 (2010).

The court refused to grant Appellant's Proposed Jury Instruction #3 on

foreseeable circumstances. J.A. 371:7-15.

"A reasonable person changes conduct according to the circumstances and the danger that is known or would be appreciated by a reasonable person. Therefore, if the foreseeable danger increases, a reasonable person acts more carefully."

MPJI-Cv 19:3.  The court's response to Appellant's objection was that the

instruction was more appropriate where contributory negligence was a factor, and

thus in this case it would have only been confusing to the jury. J.A. 371:16-20.

However, on April 30, 2009, there was a change in circumstances.  On that date, Dr. Saheta was given information regarding a pulmonary event that occurred in March, where Mr. Piehl was diagnosed with pneumonia. J.A. 191:21-192:20. The testimony of Appellant's expert was that at this point, using the risk benefit analysis, the risk of sudden death was outweighed by the risk of death caused by Amiodarone toxicity, and thus the drug should have been discontinued. J.A. 209:17-25; 211:22-212:17.  In Dr. Saheta's records he wrote:

> "...one wonders whether his recent admission with pneumonia was in fact secondary to infiltrates originating from Amiodarone pulmonary toxicity, but clinically, he appears to be doing well today."

J.A. 193:22-194:1.  A reasonable person in Dr. Saheta's shoes should have foreseen the danger of continuing to administer the drug and should have taken Mr. Piehl off the drug then, and not waited until he was in the hospital to do so.

The court refused to grant Appellant's Proposed Jury Instruction #5. J.A. 372:2-4.

> "The defendant's negligent conduct is considered a cause of the harm if the plaintiffs would not have been harmed without the negligence. The defendant's negligent conduct is also considered a cause of the harm if it was a substantial factor in bringing about the harm. This means that even if there was more than one cause bringing about the harm, the defendant is still liable if his negligence produced one of those causes."

See Yonce v. SmithKline Beecham Clinical Labs., Inc., 111 Md. App. 124, 680 A.2d 569 (1996).  The court allowed Appellee to introduce evidence on all of Mr.

23

Piehl's co-morbidities, and to imply that because of these co-morbidities, Mr. Piehl

was going to die regardless. The court's instruction on proximate cause was

"...there may be more than one cause of an injury; that is, several acts of

negligence may combine or work together in causing an injury." J.A. 370:5-7.

However, Appellant's instruction was more appropriate in clarifying that even if

there was more than one cause bringing about the harm, Dr. Saheta could still be

held liable if his negligence produced one of those causes.

The court refused to grant Appellant's Proposed Jury Instruction #6 on

proximate cause – substantial factor test. J.A. 372:18-19.

> "Where two independent causes concur to bring about an injury and either
> cause standing alone would have brought the identical harm, a defendant is
> still liable if his negligence produces one but not both of the independent
> causes. This is called the 'substantial factor test of proximate cause.' Under
> the facts and circumstances of this case, if the defendant's negligence was a
> substantial factor in causing some or all of the harm alleged, the defendant
> may still be liable."

See Yonce v. SmithKline Beecham Clinical Labs., Inc., 111 Md. App. 124, 680

A.2d 569 (1996). This instruction is similar to that of Appellant's Proposed Jury

Instruction #5, and was appropriate to further clarify this issue to the jury.

The court refused to grant Appellant's Proposed Jury Instruction #10 on

informed consent, expert testimony. J.A. 371:22-373:8.

> "In cases of informed consent, expert testimony establishes only: (1) the
> nature of the risks inherent in a particular treatment, (2) the probabilities of
> therapeutic success, (3) the frequency of the occurrence of particular risks,

24

and (4) the nature of available alternatives to treatment, and (5) whether or not disclosure would be detrimental to a patient."

See <u>Sard v. Hardy</u>, 281 Md. 432 (1977). The court gave a similar instruction, however, assuming that the court's instruction was adequate as far as it went, it didn't go far enough because it did not deal with change of circumstances requiring the doctor to do more.

The court refused to grant Appellant's Proposed Jury Instruction #11 on informed consent – change in circumstances. J.A. 373:9-14.

"Obtaining informed consent is not necessarily a one-time occurrence. A substantial change in medical circumstances requires a new informed consent discussion."

See <u>Hannemann v. Boyson</u>, 282 Wis.2d 664, 698 N.W.2d 714 (2005). This instruction goes along with Appellant's Proposed Jury Instruction #10.

When there is a change in circumstances, the doctor must revisit the nature of the risks, the frequency of the occurrence of particular risks, etc. That is, what is listed under informed consent in Appellant's Proposed Jury Instruction #10 and what Appellant's cardiologist expert, Dr. Vassallo, explained in his testimony. Dr. Vassallo testified that Amiodarone was a good idea to use in February of 2008, however fourteen months later, when dealing with a very serious side effect of the drug, Dr. Saheta needed to explain to Mr. Piehl that the risk of using Amiodarone had become high enough that it was too high to keep using, thus to reconsider his

choices and reassess the risks and benefits at that point. J.A. 211:22-212:17.

Appellant believes the court steered the jury to only consider whether or not

Amiodarone should have been prescribed. This case hinges primarily on the

monitoring of the drug once it was prescribed, and the court did not advise the jury

of the issue of monitoring.

The court refused to grant Appellant's Proposed Jury Instruction #13 on

susceptibility to injury. J.A. 374:20-375:4.

> "The effect that an injury might have upon a particular person depends upon
> the susceptibility to injury of the plaintiffs. In other words, the fact that the
> injury would have been less serious if inflicted upon another person should
> not affect the amount of damages to which the plaintiffs may be entitled."

MPJI-Cv 10:3. Appellee repeatedly introduced evidence of Mr. Piehl's cardiac

problems, yet the jury was never instructed that even though Mr. Piehl may have

been more susceptible to injury, the jury should nonetheless disregard this

information. Thus, this instruction should have been given.

## CONCLUSION

For all the reasons stated above  Appellant respectfully prays that this Court reverse the judgment of the District Court and remand this case for a new trial.

## REQUEST FOR ORAL ARGUMENT

Appellant requests an oral argument pursuant to Federal Rule of Appellate Procedure 34(a).

Respectfully submitted,

Henry L. Belsky, Esq.
Mitchell E. Rosensweig, Esq.
Schlachman, Belsky & Weiner, P.A.
300 East Lombard Street, Suite 1100
Baltimore, Maryland 21202
410-685-2022
410-783-4771(fax)
hbelsky@sbwlaw.com
*Counsel for Appellant*

Date: October 1, 2014

27

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 14-1387      **Caption:** Paula A. Piehl, et al. v. Narayan P. Saheta, M.D.

### CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the  type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [✓] this brief contains __5,647__ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [ ] this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger.  A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [✓] this brief has been prepared in a proportionally spaced typeface using __Microsoft Office Word 2013__ [*identify word processing program*] in __14-point Times New Roman__ [*identify font size and type style*]; **or**

   [ ] this brief has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s) _Henry L. Belsky_

Attorney for _Appellant_

Dated: _10/1/2014_

# CERTIFICATE OF SERVICE

I certify that on ___10/1/2014___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

> Frederick W. Goundry, III
> Matthew H. Fogelson
> Varner & Goundry, P.C.
> 121 East Patrick Street
> Frederick, Maryland 21701

_____
Signature

___10/1/14___
Date