No. 14-1387

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

---

**Paula A. Piehl, Individually and as Personal Representative
of the Estate of Martin Piehl, and Forrest Piehl, Individually
Plaintiff – Appellant**

v.

**Narayan P. Saheta, M.D.
Defendant - Appellee**

---

# APPEAL FROM THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

---

**Appellee's Brief**

---

Matthew H. Fogelson, Esquire
Frederick W. Goundry, III, Esquire
VARNER & GOUNDRY
A Professional Corporation
121 East Patrick Street
Frederick, Maryland  21701
(301) 631-1800
mfogelson@vglaw.org
fgoundry@vglaw.org
Attorneys for Appellee

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ii

STATEMENT OF THE ISSUES........................................................ 1

STATEMENT OF THE CASE…………………………………………...1

SUMMARY OF ARGUMENT…………………………………………...2

ARGUMENT…………………………………………………………..4

**I.THE DISTRICT COURT'S GENERAL "TREATMENT" OF THE ISSUE OF CONTRIBUTORY NEGLIGENCE DURING THE EVIDENTIARY PORTION OF THE TRIAL WAS NOT PRESERVED AND, IF PRESERVED, THE DISTRICT COURT WAS WITHIN ITS DISCRETION AND THE DISTRICT COURT'S RULINGS DURING OPENING STATEMENT AND, IF PRESERVED, DURING CLOSING ARGUMENT WERE WITHIN ITS BROAD DISCRETION……………………...…..4**

A.    Testimony and Evidence during trial……………….5
B.    Piehl's arguments regarding contributory negligence are largely unpreserved and/or waived…………………………11
C.    Even if this Court concludes contributory negligence was emphasized throughout the trial, and even if preserved, the trial court's ruling during Piehl's closing argument and inaction during Saheta's closing argument were not error and, even if there was error, it was harmless……………………………14

**II.    THE DISTRICT COURT CORRECTLY EXERCISED ITS BROAD DISCRETION IN PERMITTING SAHETA TO IMPEACH DR. ARDEN WITH RESPECT TO HIS EXPERT CREDENTIALS AND EVEN IF ARGUENDO THERE WAS AN ABUSE OF DISCRETION, ANY SUCH ERROR WAS HARMLESS……………………………………………17**

**III.    THE DISTRICT COURT PROPERLY INSTRUCTED THE JURY.................................................................23**

A.   There was no abuse of discretion in declining to give requested instruction number 3 on reasonable foreseeability...24

B.   There was no abuse of discretion in declining to give requested instructions 5, 6, or 13 because the jury did not reach the issues of causation or damages……………………….26

C.   There was no abuse of discretion in declining to give requested instructions 10 or 11 regarding informed consent…27

CONCLUSION………………………………………………………….31

CERTIFICATE OF SERVICE……………………………………….32

CERTIFICATE OF COMPLIANCE……………………………………….

CORPORATE DISCLOSURE STATEMENT……………………………

PERTINIENTAUTHORITY…………………………………………………

ADDENDUM – *Nguyen v. Arce*, 34 Fed. Appx. 879 (4th Cir. 2002)...…….

# TABLE OF AUTHORITIES

**CASES:**                                                                PAGE(S)

*Behler v. Hanlon*, 199 F.R.D. 553 (D.Md. 2001)……………………………...…………..20

*Bunn v. Oldendorff Carriers GmbH & Co., KG*, 723 F.3d 454 (4th Cir. 2013)……………………………………………………………………...…24, 29

*Collins v. Nat'l R.R. Passenger Corp.,* 417 Md. 217, 9 A.3d 56 (2010)……………23

*Daskarolis v. Firestone Tire and Rubber Co.*, 651 F.2d 937 (4th Cir. 1981)……………………………………………………………....12, 13

*Hannemann v. Boyson*, 698 N.W.2d 714 (Wis. 2005)…………………….…29, 30

*Insurance Services of Beaufort, Inc. v. Aetna Cas. and Sur. Co.*, 966 F.2d 847 (4th. Cir 1992)………………………………………………...........12

*King v. McMillan,* 594 F.3d 301 (4th Cir.2010)……………………………24

*Nguyen v. Arce*, 34 Fed. Appx. 879 (4th Cir. 2002) …………………...…………………15

*Sard v. Hardy*, 281 Md. 432, 379 A.2d 1014 (1977) …………………...........................8

*Taylor v. Virginia Union University,* 193 F.3d 219 (4th Cir. 1999)……...…………22

*United States v. Guay*, 108 F.3d 545 (4th Cir. 1997)………………...…………………19

*United States v. Rogers*, 918 F.2d 207 (D.C. Cir. 1990)……………………...….………...…12, 13

*Volvo Trademark Holding Aktiebolaget v. Clark Mach. Co.,* 510 F.3d 474 (4th Cir.2007)………………………………………………………..23

*Westfarm Assoc. Ltd. Partnership v. Washington Suburban Sanitary Com'n*, 66 F.3d 669 (4th Cir. 1995)………………………………………...……15

**RULES AND STATUTES:**                                                  PAGE(S)

Fed. R. Evid.  611…………………………………………………………19

## STATEMENT OF THE ISSUES

1.     Was the District Court's general "treatment" of the issue of contributory negligence during the evidentiary portion of the trial preserved and, if preserved, was the District Court within its discretion and were its rulings during opening statement and, if preserved, during closing argument within its broad discretion?

2.     Did the District Court correctly exercise its broad discretion in permitting Saheta to impeach Dr. Arden with respect to his expert credentials and even if arguendo there was an abuse of discretion, was any error harmless?

3.     Did the District Court properly instruct the jury?

## STATEMENT OF THE CASE

During trial, Piehl called Joseph Vassallo, M.D. as an expert in cardiology. Dr. Vassallo testified that he would have stopped prescribing Amiodarone at some point after April 30, 2009 because patient monitoring, including pulmonary function testing and x-rays, by a physician is required while taking that medication. Supplemental Appendix ("S.A.") 2-3.

Dr. Philip Buescher, an expert in pulmonology called by Saheta, testified at trial that the standard of care does not require that a patient be monitored by repeat pulmonary function tests and x-rays. J.A. 240-241. Dr. Buescher also testified that the standard of care did not require Saheta to discontinue Amiodarone after the April 30, 2009 visit. J.A. 250-251. He also testified that Piehl never had Amiodarone toxicity. S.A. 8-13. Dr. Edward Platia, an expert in cardiology called by Saheta, testified at trial that standard of care does not require that a patient taking Amiodarone be monitored by repeat pulmonary function tests and x-rays.

1

J.A. 299-301, 309; S.A. 14. Dr. Platia also testified Saheta was not required under the standard of care to discontinue Amiodarone (used to try to decrease the risk that a patient would die of cardiac arrhythmia) after Piehl's April 30, 2009 appointment. J.A. 310. Dr. Platia noted that at the time Amiodarone was discontinued, Piehl was in a hospital where he would receive "24/7" cardiac monitoring. S.A. 15. Dr. Platia also gave the opinion that Piehl did not ever develop Amiodarone toxicity and that his cause of death was not Amiodarone toxicity, but rather of pneumonia due to an unknown cause. S.A. 15-22.

On April 2, 2014, the jury returned a verdict finding that Saheta did not violate the standard of care in his treatment of Piehl and that Saheta had properly advised Piehl of material risks associated with Amiodarone. As a result the jury did not reach the issues of causation or damages. J.A. 377-378; S.A. 49-50.

Additional facts will be provided as necessary in the argument section below.

## SUMMARY OF ARGUMENT

Piehl's argument (his Argument II, addressed below in Argument I) that the District Court's treatment of contributory negligence was an abuse of discretion is without merit for several reasons. First, the issue of contributory negligence played a far smaller role during trial that Piehl depicts in his brief. Second, Piehl's

arguments regarding testimony during trial and Saheta's closing argument are not preserved for appeal. Third, Piehl acquiesced to the trial court's ruling and instruction that contributory negligence was "not an issue" during his closing argument. The District Court's overruling of Piehl's objection during Saheta's opening statement was not an abuse of discretion. Finally, any error by the District Court was harmless here were the jury was not instructed on the issue of contributory negligence and the issue did not appear on the verdict sheet.

In his next argument (his Argument III, addressed below in Argument II), Piehl argues that the District Court erred by permitting impeachment of the credentials of one of his expert witnesses, Johnathan Arden, M.D. concerning problems that arose during the five years he was the Chief Medical Examiner for Washington, D.C. Permitting the impeachment was well within the District Court's broad discretion where Arden both referred to his former position in his testimony and included it on his CV with the purpose of bolstering his own credibility before the jury. Even if this Court were to find an abuse of discretion, any such error would be harmless here where the jury decided the case on standard of care and informed consent and did not reach the issue of causation, the topic covered by Arden's testimony.

Piehl's last argument (his Argument IV, addressed below in Argument III) suggests that the District Court committed reversible error by failing to give six of

his requested instructions to the jury. None of the instructions were required under the circumstances of this case and the requested instructions were either otherwise covered during the instruction of the jury and/or not given to avoid confusion. With regard to Piehl's requested instructions 5 and 6 (dealing with causation) and 13 (susceptibility to injury – relating to damages), even if the Court were to find error in the decision not to instruct, any such error would be harmless where the jury did not reach the issues of causation or damages.

## ARGUMENT

### I. THE DISTRICT COURT'S GENERAL "TREATMENT" OF THE ISSUE OF CONTRIBUTORY NEGLIGENCE DURING THE EVIDENTIARY PORTION OF THE TRIAL WAS NOT PRESERVED AND, IF PRESERVED, THE DISTRICT COURT WAS WITHIN ITS DISCRETION AND THE DISTRICT COURT'S RULINGS DURING OPENING STATEMENT AND, IF PRESERVED, DURING CLOSING ARGUMENT WERE WITHIN ITS BROAD DISCRETION.

In his Argument II, Piehl suggests that that the District Court mishandled the issue of contributory negligence throughout the trial despite the fact that the District Court declined Saheta's request that the jury be instructed on the issue of contributory negligence. S.A. 43-48. Piehl argues that the District Court erred in overruling their objection during Saheta's opening statement referencing contributory negligence. By allowing this comment in opening statement and, after what they claim was testimony on the issue of Piehl's contributory negligence

4

(to which there was no objection), and after Saheta being "allowed" to argue contributory negligence in closing argument, the District Court erred in sustaining Saheta's objection to Piehl's rebuttal closing argument wherein he expressly addressed contributory negligence. Piehl claims, misleadingly, that by so ruling during the rebuttal closing argument, the issue of contributory negligence "brought up in opening statements by Appellee's counsel and still on the table as far as jury was concerned, [was left] unanswered." Piehl Brief at 8.

Piehl's arguments regarding contributory negligence suffer from several fatal flaws. First, Piehl drastically overstates the degree to which contributory negligence was emphasized during trial. Second, Piehl's arguments are largely unpreserved or waived. Third, the trial court committed no error in any of its actions or inaction. Finally, even this Court found any matter preserved and found there was error, there was no prejudice to Piehl under the circumstances of this case.

A.    Testimony and Evidence during trial

In his brief, Piehl points to the testimony of Saheta, Philip Buescher, M.D. (called by Saheta as an expert in the fields of pulmonology and critical care medicine), and Edward V. Platia, M.D. (called by Saheta as an expert in the field of cardiology). Piehl misleadingly suggests that "Appellee called expert after expert to testify in regards to refusing a defibrillator" implying that each of the

5

above devoted extensive time to talking solely about alleged contributory negligence in declining a defibrillator.  Brief of Piehl at 16.

This is not accurate for two reasons. First, in so suggesting, Piehl sidesteps Saheta's records that were admitted into evidence without objection.  These records, necessarily discussed by the above witnesses, contain references both to Saheta's repeated recommendations for a defibrillator (referred to in the records as a "PCD" and  "AICD" ) and Piehl's decision to put off or decline this recommendation in 2007  (J.A. 116-11), 2008 (J.A. 118), and 2009 (J.A. 121).

The suggestion that the that the standard of care for treating a patient with a known ventricular arrhythmia such as Piehl was the implantation of a defibrillator was not a post hoc theory created by Saheta's experts to cast blame upon Piehl, but rather Saheta's opinion at the time he was treating Piehl. For example, in his May 20, 2008 note, Saheta noted that he had "discussed with the patient again that the *standard of care* seems to be that the patients left ventricular ejection fraction of 30% or below 30% *should receive prophylactic PCD* [ a type of defibrillator], but the patient is adamantly against it since he is symptom free." J.A. 119 (emphasis added).

Second, the testimony during trial cited by Piehl certainly cannot be fairly read to focus solely on contributory negligence.  Piehl complains that during his testimony, Saheta testified that he recommended a defibrillator on a number of

6

occasions. This is a recounting of what was recorded by Saheta in his medical records and cannot fairly be seen as solely relevant to the issue of contributory negligence. J.A. 314:18-22; 315:19-316:6; 316:25-317:5. Saheta's discussion of a defibrillator being the "number one option" occurred during his testimony regarding the risks of Amiodarone and alternatives to that medication. It explained his thought process as to why he first recommended a defibrillator to Piehl and subsequently prescribed Amiodarone. J.A. 318:23-319:23. There was no objection to Saheta's testimony and it was consistent with his above described medical records.

In the portion of Dr. Platia's testimony cited by Piehl, Platia, without objection, went through Saheta's aforementioned medical records, gave opinions that Saheta complied with the standard of care in his treatment of Piehl during his appointments with Saheta, and explained Piehl's medical condition over time J.A. 280-288; 289:19-290:22; 291:12-18; 293:10-295:21; 303:13-22. Platia's testimony that the medical records indicate that a defibrillator was recommended on a number of occasions (as required by the standard of care in Platia's opinion) and declined by the patient is far different from Dr. Platia testifying that in his opinion Piehl was, in fact, contributorily negligent. Dr. Platia stated during his testimony that "the patient has a right to decide what they would like to do in terms of their

7

care."[1] J.A. 294. Dr. Buescher likewise, and again without objection, explained what a defibrillator was, opined that it was reasonable for Saheta to recommend it, and testified concerning Saheta's medical records including Piehl's condition and Saheta's recommendations. J.A. 230-238.

None of the other testimony relied upon by Piehl made any specific reference to contributory negligence, but rather focused upon what the standard of care required when a patient declined a defibrillator. The testimony closely mirrored Saheta's records and his own opinion contained therein that Piehl should receive a defibrillator. J.A. 119; 241-243. [2]

---

[1] This is the exact argument put forth on appeal by Piehl for why contributory negligence was not an issue in this case. Piehl states that "The patient has the right to select his modality of treatment." Piehl Brief at 12. Contrary to Piehl's further argument on that topic, such a statement is neutral on the issue of contributory negligence. A conscious and otherwise competent patient of the age of majority generally has the right to decline medical treatment. *See Sard v. Hardy*, 281 Md. 432, 438-39, 379 A.2d 1014 (1977) (noting the "universally recognized rule that a physician, treating a mentally competent adult under non-emergency circumstances, cannot properly undertake to perform surgery or administer other therapy without the prior consent of his patient.") That is a different issue, however, from *whether* it was negligent for a patient to do so in any given situation, an area into which Platia did not venture.

[2] Piehl's complaint that testimony that Amiodarone was the second choice treatment behind a defibrillator was somehow improper or merely an attempt by Saheta to discuss contributory negligence is also entirely disingenuous as Piehl's own expert in cardiology, Joseph Vassallo, testified during direct examination that "Amiodarone, although it's not as good as a defibrillator, is a good second, second means of treating that." S.A. 1. He testified on cross examination that he agreed with Saheta on that point. S.A. 4-7. Dr. Vassallo also agreed that Saheta's medical records made clear that he recommended a defibrillator to Piehl on

While Saheta readily acknowledges that some of testimony of these witnesses could be used in support of an argument for contributory negligence, it is also relevant to other issues including Piehl's medical condition, Saheta's treatment of Piehl and whether it complied with the standard of care, why Amiodarone was prescribed to Piehl, and the dangers of discontinuing Amiodarone. It is not the case that the focus of these witnesses testimony was on contributory negligence. To place the cited portions in context, Piehl has cited to 16 pages of Platia's testimony while his direct examination spans pages 106 through 159 of the transcript from March 27, 2014 and pages two through 21 of the transcript from April 1, 2014. Piehl cited to 11 pages of Dr. Buescher's testimony while his full direct examination takes up pages 123 through 194 of the transcript from March 26, 2014.

Piehl also complains that Saheta argued contributory negligence "under the guise of causation", but Piehl concedes "the words 'contributory negligence' were never mentioned" during Saheta's closing argument. Piehl brief at 17. In fact, the argument went to issues of standard of care and causation. Much of what Piehl complains of are, again, mere references to information clearly contained in Saheta's medical records (admitted without objection), the (unobjected to) testimony describing same, and the expert testimony opining that Saheta complied

---

multiple occasions and that defibrillator was Saheta's first choice for treating Piehl while Amiodarone was his second choice. S.A. 4-5.

with the standard of care because prescribing Amiodarone was reasonable after Piehl declined a defibrillator. J.A. 329:7-10; 337:25-339:5; 335:3-20. Saheta's statement during closing argument that if you decline a defibrillator "you cannot then blame the doctor if you die a sudden death. You can't expect well, okay, I'm going to refuse this defibrillator, and then if I have an arrhythmia and die, well you can't then hold the doctor responsible for that" was commentary on the possible significance of refusing the defibrillator, the preferred method of treatment, and helped to explain why Piehl needed to remain on Amiodarone. It was not an argument for contributory negligence as Piehl did not die from an arrhythmia. Piehl's suggestion that Saheta sought to mislead the jury as to the cause of death is belied by the fact that Saheta explained to the jury that it was his position that the cause of death was cryptogenic organizing pneumonia. J.A. 342-343.

Saheta's contributory negligence argument was *not* made during closing argument, but it was explained when objecting to the District Court's decision not to give the contributory negligence instruction was different. Saheta argued to the District Court that he believed Piehl was contributorily negligent in that he would not have died from Amiodarone toxicity had he followed Saheta's repeated recommendation to have a defibrillator implanted. S.A. 26-27.

The evidence pointed to by Piehl as evidence of contributory negligence was relevant to other issues in the case and came directly from the medical records. To

10

the extent that this evidence was relevant to alleged contributory negligence, there was no prohibition on Saheta trying to put forth such evidence during trial. Piehl has misrepresented, or at the very least misconstrued, Saheta's closing argument. For these reasons alone, there is simply no issue here with regard to the District Court's "treatment" of contributory negligence.

B. Piehl's arguments regarding contributory negligence are largely unpreserved and/or waived.

It is surprising that Piehl raises such a potentially broad complaint about contributory negligence on appeal. Piehl never made the argument during trial, as he now does on appeal, that the overall "treatment" of the issue of contributory negligence by the District Court was erroneous or in any way prejudicial or otherwise improper. Piehl never filed a motion *in limine* seeking to exclude any attempt to introduce contributory negligence at trial. Piehl argued, successfully, against the reading of a contributory negligence instruction to the jury. Piehl never requested that the District Court instruct the jury that it was not to consider contributory negligence. Piehl did not object to any of the evidence he now suggests dealt with contributory negligence or ask for a limiting instruction with regard to any of that evidence. Piehl did not object to those portions of Saheta's closing argument that he now suggests were improper.

Most of Piehl's specific arguments are therefore not preserved for appeal. In general, "If a party fails to make a timely objection to an error, that issue is not

11

preserved for review." *Insurance Services of Beaufort, Inc. v. Aetna Cas. and Sur.*

*Co.*, 966 F.2d 847, 852 (4th. Cir 1992).

Even an objection is not sufficient to preserve every issue for appeal.

> Beyond presenting and arguing a point, an objecting
> party has a further duty to make clear, after the ruling,
> that he is still pressing it. Otherwise, unaware of the
> party's continuing objection, the court is deprived of the
> opportunity, or at least of any good reason, to reconsider
> its ruling.

*Daskarolis v. Firestone Tire and Rubber Co.*, 651 F.2d 937, 940 (4th Cir. 1981)

(quoting *Subecz v. Curtis*, 483 F.2d 263 (1st Cir. 1973)). As Justice Clarence

Thomas, then a Circuit Judge, explained:

> When an objecting lawyer withdraws his objection after
> the judge rules, the judge has no reason to reconsider his
> ruling, and the other side's lawyer has no reason to
> propose an alternative course of action. If, therefore, a
> lawyer has acquiesced in a ruling he once claimed was
> erroneous, the lawyer must reassert his prior objection if
> he expects to preserve it for appeal."

*United States v. Rogers*, 918 F.2d 207, 212 (D.C. Cir. 1990). *Daskarolis* and

*Rogers* stand for the proposition that if a party acquiesces to a trial court's ruling,

then any assignment of error to that ruling on appeal is waived.

In the case *sub judice*, the following colloquy ensued during Piehl's rebuttal

closing argument:

The Court: Any rebuttal argument?

12

[Counsel for Piehl]: Unfortunately, yes. [Counsel for Saheta] spent a lot of time speaking about defibrillators. [Counsel for Saheta] told you in his opening statement that there is this concept in law about contributory negligence, and that my client was guilty of contributory negligence [sic] one percent. I remember the word, one percent. You will get no instruction –

[Counsel for Saheta]: Objection.

The Court: Sustained. *It's not an issue.*

[Counsel for Piehl]: *Well, I'll take that. It's not an issue.* The defibrillator, he did not die of not having a defibrillator. He died of not having Amiodarone -- of having Amiodarone and dying of Amiodarone toxicity.

J.A. 360-361 (emphasis added).

On appeal, Piehl complains with regard to the above that when he "attempted on rebuttal to address contributory negligence, the court denied [him] such opportunity." Piehl Brief at 18. Piehl concedes however that while the objection was sustained the court stated that contributory negligence "was not an issue." Piehl Brief at 19. By stating "I'll take that. It's not an issue," Piehl clearly acquiesced in the District Court's resolution of Saheta's objection. There is simply no other way to interpret Piehl's comment. The reasoning from *Daskarolis* and *Rogers* certainly applies to the situation here where the party who is subject to the objection voices their assent to the court's resolution of the objection because the court is likewise "deprived of the opportunity, or at least of any good reason, to reconsider its ruling." This is not a situation where the District Court simply

13

sustained the objection. Here, the District Court also stated on the record and in the presence of the jury that contributory negligence was not an issue, a statement that clearly satisfied Piehl who was apparently trying to make that same point to the jury. Piehl cannot complain on appeal about a ruling and curative instruction to which he unequivocally voiced assent during trial.

It is not clear to Saheta if on appeal Piehl is also claiming that the District Court erred by "allowing" the testimony of Drs. Saheta, Platia, and Buescher *supra*, but it is very clear that no such complaint is preserved there having been no objection to that testimony.

Piehl appears to complain[3] that during Saheta's closing argument, the District Court erred because Saheta was "*given the opportunity* to again argue contributory negligence on closing, under the guise of causation" and "*allowed* to argue Mr. Piehl was at fault for his own death." Piehl Brief at 17,18 (emphasis added) These complaints are, again, raised for the first time on appeal. There was absolutely no objection by Piehl during Saheta's closing argument and so, again, these arguments are not preserved for review under F.R.E. 103.

C. Even if this Court concludes contributory negligence was emphasized throughout the trial, and even if preserved, the trial court's ruling during

---

[3] It is not clear whether Piehl is actually seeking reversal and assigning error, albeit totally unpreserved, by the District Court during the testimony of Drs. Platia, Buescher and Saheta and during Saheta's closing argument or if these portions of the trial have been discussed to try to add weight to the argument that the trial court erred in sustaining Saheta's objection during Piehl's closing argument.

14

Piehl's closing argument and inaction during Saheta's closing argument were not error and, even if there was error, it was harmless.

Piehl complains "the court never explained to the jury that [contributory negligence] was not an issue." Piehl Brief at 14. First, as set forth *supra*, the District Court did indicate, literally, that contributory negligence was "not an issue." Based only on this, the Court need go no further in its analysis.

Even if the Court considers the District Court's ruling during closing argument, Piehl's complaint must also fail because he never made any request during closing argument or otherwise that the District Court so instruct the jury. It is not reversible error to fail to give a limiting instruction where one was not requested. *Westfarm Assoc. Ltd. Partnership v. Washington Suburban Sanitary Com'n*, 66 F.3d 669, 685 n. 12 (4th Cir. 1995).

Second, the situation is this case is analogous to that in *Nguyen v. Arce*, 34 Fed. Appx. 879 (4th Cir. 2002) (per curiam). That case arose out of a motor vehicle accident between the appellants' sedan and two tractor trailers driven by appellees that occurred when the sedan lost power and came to a stop on the interstate before being struck by both tractor trailers. *Id.* at 880-81. During trial, the appellees attempted to establish that the appellant driver was contributorily negligent for failing to inspect and maintain her vehicle. *Id.* at 881. This issue was ultimately not allowed to go the jury.

15

On appeal, appellants suggested that the trial court erred in overruling their objection to a portion of the appellees' closing argument that they believed "intentionally injected [appellant driver's] contributory negligence back into the case". *Id.* at 883. This Court held that "Even assuming that the statements made in closing argument were improper, we find that they did not prejudice appellants." *Id.* In so holding the Court explained:

> we see no way [appellant driver] would have been prejudiced because her negligence was not an issue the jury was instructed to decide. In addition to [co-appellant's] contributory negligence, the only issue for the jury to decide was that of *defendants'* negligence. Jurors are presumed to follow the law, *see Brinkley–Obu v. Hughes Training, Inc.,* 36 F.3d 336, 354 (4th Cir.1994), and we see nothing in the record to suggest that they did not do just that here. It would be mere speculation for us to find that the jury imputed some sort of contributory negligence on the part of [appellant] into its finding that the defendants were not negligent.

*Id.* The Court also noted that "the court instructed the jury that closing arguments by counsel are not to be considered evidence in the case." *Id.*

Here, even assuming the issue of contributory negligence was improperly injected into the case, there is no way Piehl would have been prejudiced because contributory negligence was not an issue that the jury was instructed to decide. S.A. 23-42. The issue did not appear on the verdict sheet. S.A. 49-50. As in *Nguyen*, it would be mere speculation for this Court to find that the jury "imputed

some sort of contributory negligence to [Piehl] into its finding that the defendants were not negligent."[4] Also as in *Nguyen*, the District Court here instructed the jury that counsel's arguments are not evidence and "what the lawyers say to you is not binding on you in any way." S.A. 26-27.

For the same reasons stated *supra*, the District Court's ruling during opening statement argument could cause no possible prejudice to Piehl here. The ruling was not possibly error as it came at the beginning of the trial when there had been no pre-trial motion seeking to preclude such a reference, let alone a prior ruling that counsel was not to address contributory negligence during opening statement. Absent some proffer or argument by Piehl to support his objection, there was no way for the District Court to conclude during opening statement that contributory negligence was not going to be an issue in this case. It was certainly not error under the circumstances for the District Court to permit a mention of contributory negligence at that early point in the trial.

## II.    THE DISTRICT COURT CORRECTLY EXERCISED ITS BROAD DISCRETION IN PERMITTING SAHETA TO IMPEACH DR. ARDEN WITH RESPECT TO HIS EXPERT CREDENTIALS AND EVEN IF ARGUENDO THERE WAS AN ABUSE OF DISCRETION, ANY SUCH ERROR WAS HARMLESS.

---

[4] The same argument holds true for Piehl's arguments concerning the supposedly improper statements by Saheta during his closing argument.

In his Argument III, Piehl argues that it was an abuse of discretion for the District Court to permit Saheta to question Johnathan Arden, M.D., a witness called by Piehl as an expert in pathology. Piehl concedes that "this Court generally gives great discretion to the trial judge on issues such as this." Piehl Brief at 20. Piehl claims that "both the importance of this testimony and the manner in which Appellant's counsel and the lower court were blindsided, should weigh heavily in favor of exclusion." Piehl Brief at 20. Piehl sets forth no other basis for reversal beyond the above and Piehl cites no authority whatsoever beyond Federal Rules of Evidence 402 and 403 as to why there was an abuse of discretion in support of his argument. Neither of the grounds set forth by Piehl supports a finding the trial court erred and, in any event, even if this Court were to conclude it was error to permit this line of inquiry, any such error was absolutely harmless.

During direct examination, Arden testified that his "20 years in full-time government service as a medical examiner" included "about five and a half years as the Chief Medical Examiner for Washington D.C." J.A. 213. Arden's CV was moved into evidence. J.A. 214. That CV likewise states that Arden was so employed from April 1998 through October 2003. J.A. 147

Saheta began to question Arden as to a report generated by the Office of the Inspector General concerning the Washington D.C. Office of the Chief Medical Examiner ("the report") and Piehl objected. J.A. 215. In permitting the inquiry to

18

continue, the District Court stated "[t]he problem is you've put in this CV and had [Arden] testify at some length about all of his background indicating high quality expertise in this area." J.A. 218-219.  The District Court also stated "[a]nd it seems to me that [the report] possibly refutes the quality of some of his background." J.A. 219.

Some of the findings confirmed by Arden during the ensuing examination were that:

- Arden "frankly acknowledged problems within the agency" and his "accountability for the agency's performance." (J.A. 222:8-9)
- there was a significant backlog of autopsy reports (J.A.  222:12-15)
- storage of unreleased bodies that violated "district regulations and creates unsanitary conditions" (J.A. 222:16-19)
- "improper handling of x-ray equipment endangered employees" J.A. 222:20-22)
- employees were not trained to "properly dispose of biohazardous waste" and were exposed to such waste."  (J.A. 222:24-25-223:1-2)

As acknowledged by Piehl, trial courts have broad discretion over the scope of cross examination. *United States v. Guay*, 108 F.3d 545, 552 (4th Cir. 1997). Under Federal Rule of Evidence 611(b), "Cross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility."  The United States District Court for the District of Maryland has described the range of methods of impeachment as follows:

> The adoption of the Federal Rules of Evidence, which expressly recognized fewer methods of impeachment than had existed at common law, was not intended to

19

preclude those forms of impeachment that were not explicitly recognized, but instead to substitute a "relevance" based approach to impeachment of credibility, under Rules 401, 402 and 403, for the common law approach. Under such an approach, the focus would be whether there was any logical tendency of information to make a witness' trial testimony less credible than it would be absent introduction of the impeaching information. If so, then it would be admissible for impeachment, regardless of whether it fit into one of the common law's "cubbyholes" of impeachment, provided its exclusion was not required by Rules 402 or 403. Thus, as will be seen, each of the common law techniques of impeachment, including bias/interest/prejudice impeachment, that are not the subject of a specific rule of evidence, may still be used today.

*Behler v. Hanlon*, 199 F.R.D. 553, 556 (D.Md. 2001) (internal citation omitted).

There can be no serious argument that it was error of any kind, let alone an abuse of discretion for the District Court to allow this brief inquiry into events that transpired while Arden held the prestigious position of Chief Medical Examiner for Washington D.C., a position previously mentioned by him in his testimony and included on his CV, one month prior to his resignation from that position. As the District Court here correctly noted, the findings of the report "possibly refutes some of the quality" of Arden's background. The general suggestion that the report dealt only with "management" issues makes no difference here. Even if that were so (which it is not), it was a case of attacking a high management position with evidence that he failed at same. Surely the hope in mentioning was that it

20

would serve to enhance his credibility with the jury without regard to whether he obtained such a position due to his abilities as a physician. Members of a jury could have found Arden more credible because of his former prestigious position thus evidence showing that he resigned such a position following a report reaching specific conclusions about his shortcomings in that position are fair game to impeach his credibility. After trying to bolster his credibility through the use of his former post, Piehl's cries of unfairness when his credibility was attacked due to his conduct in that post cannot be taken seriously.

Piehl also got to address the issue concerning the report by asking Arden whether he had been criticized "as a forensic pathologist" to which Arden responded "no" and other questions related to how the jury should view criticism contained in the report. J.A. 225.

Piehl's claim that he was "blindsided" with the report can be easily dispatched. First, Piehl complaint is that he was blindsided by publically available information regarding *his own witness*. This is not a situation where a party did not, upon request, provide information about his own case or his own experts that would otherwise be unavailable to the opposing party. To the extent that Piehl was unaware of this information prior to trial, his complaint should directed inward and/or toward Arden. Second, Piehl never alleged that Saheta had committed a discovery violation by not turning over such information. Piehl certainly did not

21

lay a foundation for such a claim in that he never suggested that he had ever *asked* for such information during discovery.

Even if the Court were to conclude that was it was error to permit such examination of Arden, any such error would be utterly harmless. To find an error harmless the Court "need only be able to say 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error[s].' " *Taylor v. Virginia Union University,* 193 F.3d 219, 235 (4th Cir. 1999) ( quoting *United States v. Heater,* 63 F.3d 311, 325 (4th Cir.1995) which in turn was quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), *abrogated on other grounds, Desert Palace Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003))

Arden's suggestion that "the importance of this testimony . . . should weigh heavily in favor of exclusion" is without merit. Piehl states that "Dr. Arden was the Appellant's chief expert on *causation.* Dr. Arden was a pathologist and thus had no expertise on the standard of care issues in this case. The Appellant was relying on Dr. Arden's testimony to show the jury that Mr. Piehl died of Amiodarone toxicity." Piehl Brief at 20-21. As previously noted, the jury found that Saheta did not breach the standard of care and provided informed consent and thus the jury did not even reach the issue of causation (questions two and four on

22

the verdict sheet). S.A. 49-50; J.A. 377-378. As the jury did not reach the issue of

causation, any error during Arden's testimony, focusing as it did solely on the topic

of causation, was necessarily harmless.

## III.   THE DISTRICT COURT PROPERLY INSTRUCTED THE JURY

A trial court's instruction to the jury is reviewed under the abuse of

discretion standard[5] while:

> keeping in mind that "a trial court has broad discretion in
> framing its instructions to a jury." *Volvo Trademark
> Holding Aktiebolaget v. Clark Mach. Co.,* 510 F.3d 474,
> 484 (4th Cir.2007). "Instructions will be considered
> adequate if construed as a whole, and in light of the

---

[5] Saheta believes that federal law governs the review of the jury instructions here.
It is still notable that Piehl provides a suspiciously incomplete version of Maryland
law in his brief when he cites *Collins v. Nat'l R.R. Passenger Corp.,* 417 Md. 217,
229, 9 A.3d 56 (2010) for the proposition that "litigants are entitled to have their
theory of the case presented to the jury, provided the theory is a correct exposition
of the law and is supported by the evidence." *Collins* also stated the following:

> There are three requisite components to our analysis of
> whether the proposed instruction should have been
> incorporated into the ultimate charge to the jury: (1) the
> requested jury instruction must be a correct exposition of
> the law; (2) the particular law must have been applicable
> to the evidence before the jury; and (3) the substance of
> the requested instruction must not have been fairly
> covered by the instructions actually given.

*Id.*

The portion quoted by Piehl, makes no reference to the third "requisite
component." Maryland appellate courts also examine "the probability that the
absence of the instruction impacted the jury's deliberations." *Id.* at 230.

> whole record, they adequately informed the jury of the
> controlling legal principles without misleading or
> confusing the jury to the prejudice of the existing party."
> *King v. McMillan,* 594 F.3d 301, 311 (4th Cir.2010)
> (internal quotation marks and brackets omitted)

*Bunn v. Oldendorff Carriers GmbH & Co., KG*, 723 F.3d 454, 468 (4th Cir. 2013).

Further, "Even if a jury was erroneously instructed, however, we will not set aside

a resulting verdict unless the erroneous instruction *seriously* prejudiced the

challenging party's case." *Id.* (quoting *Coll. Loan Corp. v. SLM Corp.,* 396 F.3d

588, 595 (4th Cir.2005)) (emphasis added).

Piehl makes no suggestion that there was an error of law or misinstruction of

the jury, but rather nibbles around the edges by suggesting certain additional

instructions could have been given. In so advocating, Piehl makes no argument or

showing of prejudice, let alone serious prejudice, due to the District Court's

decision not to give any of the instructions raised on appeal.

A. There was no abuse of discretion in declining to give requested
instruction number 3 on reasonable foreseeability

The District Court gave the following instruction to the jury on the issue of

negligence:

> Negligence is doing something that person using
> ordinary care would not do, or not doing something that a
> person using ordinary care would do. Ordinary care
> simply means that caution, that attention or skill that
> *reasonable person would use under similar
> circumstances.*

24

> A health care provider is negligent if the health care provider does not use that degree of care and skill which a *reasonably competent health care provider* engaged in a similar practice, and *acting in similar circumstance,* would use.

S.A. 32 (emphasis added)

The above instructions provided both the "reasonable person" and "under similar circumstances" language to the jury. These instructions, Maryland Pattern Jury Instructions 19:1 and 27:1, were both requested by Piehl. J.A. 92, 95. There is no dispute that these instructions constitute a correct statement of Maryland's law on the issues of negligence and standard of care as those concepts apply to health care providers.

The instructions, as given, were certainly sufficient to permit a jury to consider whether Saheta used the degree of care and skill that a reasonably competent health care provider would use under the circumstances present on April 30, 2009 based upon the testimony of witnesses presented by the parties.

The "reasonable foreseeability" instruction was unnecessary and could easily have confused the jury here with its language that "a reasonable person acts more carefully" as a suggestion that the instructions given were somehow modified with regard to the duty owed by a health care provider by *requiring* that he change his treatment in the event they found that there was a change in circumstances. When evaluating Saheta's care on April 30, 2009 (or at any other point in time for

25

that matter), to correctly apply the law, the jury needed to determine whether Saheta exercised the degree of care and skill of a reasonably competent health care provider under the particular circumstances present on that date. The jury had the option of determining whether there had been a change of Piehl's circumstances or an increase in danger to him on April 30 and, finding further whether or not Saheta should have discontinued Amiodarone or taken any other actions.

B.    There was no abuse of discretion in declining to give requested instructions 5, 6, or 13 because the jury did not reach the issues of causation or damages

Piehl's requested instructions 5 and 6 (causation) and 13 (susceptibility to injury - damages) are very easily dispatched. The jury did not reach the issues of causation or damages and thus there could be no possible prejudice to Piehl (and he suggests none) because these instructions were not given. J.A. 377-378; S.A. 49-50

Even if addressed, the District Court committed no error by declining to give instructions 5 or 6. First, Piehl acknowledges a causation instruction was given and took no exception with it during trial or on appeal. That instruction made very clear that "the malpractice or the negligence must be *a* cause of the injury, meaning that it must be proved that the act or the failure to act played a *substantial part* in [the injury]" S.A. 32-33 (emphasis added). Such instruction adequately informed the jury on the issue of causation and covered the same topics in Piehl's requested

26

instructions 5 and 6.  Second, Piehl suggests only that instruction 5 was "more appropriate in clarifying there can be more than one cause of harm" and that instruction 6 was "appropriate to further clarify this issue to the jury."  Claims that such instructions were "appropriate" to "further clarify" are far from establishing that the District Court's decision not to give those instructions was "seriously prejudicial."   In fact, it is a concession that the issue has been otherwise addressed.  Third, Piehl addressed this particular aspect of causation during his rebuttal argument.  J.A. 362.

Requested instruction 13 - susceptibility to injury - was not appropriate to this case as there was no evidence that the alleged injury to Piehl, Amiodarone toxicity, would have been less serious if inflicted upon another person.  It was never suggested that Piehl's cardiac problems made him more susceptible to Amiodarone toxicity.

C.    There was no abuse of discretion in declining to give requested instructions 10 or 11 regarding informed consent

Piehl's requested instructions 10 and 11 both deal with informed consent.  The District Court gave the following instruction regarding informed consent:

> The second theory in support of the plaintiffs' claims for damages is a claim that Dr. Saheta failed to provide the plaintiff, Martin Piehl, with the necessary medical information needed by Mr. Piehl to make a properly informed decision about agreeing to the treatment of his condition with the drug Amiodarone.

27

This legal theory is generally referred to in the law as the doctrine of informed consent, and it's based on the concept that before a physician provides medical treatment to the patient, that the physician is required to explain the treatment to the patient and to warn of any material risks or dangers of the treatment or procedures so that the patient can make an intelligent and informed decision about whether or not to go forward with the proposed treatment or procedure.

In fulfilling the duty to disclose, the physician is required to reveal to the patient the nature of the medical condition, the nature of the proposed treatment or procedure, the probability of success of the proposed treatment or procedure, and any alternatives, and the material risks of unfortunate outcomes associated with such treatment.

A material risk in the law is a risk which a physician knows, or ought to know, would be significant to a reasonable person in the patient's position to allow the patient to make an intelligent decision about the procedure. The question of whether a risk is material risk is based on whether a reasonable person in the position of the patient wouldn't have considered the risk to be a material risk. Whether the patient would have consented to the procedure if informed of the risk is a relevant factor to be considered; although that's not conclusive.

So the physician is not required to discuss relatively remote risks when it is known that such risk are of very low incidents, but needs only to discuss those which are material to the intelligent decision of a reasonably prudent patient.

It is the plaintiffs' burden to prove by a preponderance of the evidence that Martin Piehl would not have given consent to proceed with Amiodarone prescription treatment if he had been given an adequate disclosure of material risks.

S.A. 33-35

Piehl accepts that the above instruction, virtually identical to his requested instruction 8 (J.A. 62), is "adequate as far as it went", but "didn't go far enough" because "it didn't deal with change of circumstance requiring the doctor to do more." Piehl brief at 25.  The argument that a physician could breach his duties with regard to informed consent more than once in the same course of treatment does not require further instruction, but rather is an issue for closing argument. Piehl was in no way limited in this regard. Put another way, Piehl's concerns seem to focus on whether Saheta's informed consent duties were breached more than once.

Requested instruction 10, is a virtual repeat of the elements of informed consent included above.  During trial Piehl stated only that instruction 10 "was just a little bit different" from the informed consent instruction given. J.A. 373.  This is no more than a general objection, failing to articulate any specific basis for why the instruction should have been given. As a result, any issue concerning instruction 10 was not preserved for appeal. *See Bunn*, 723 F.3d at 468-69.  Instruction 10 also does not expressly reference the "change of circumstance" issue raised on appeal, so even if preserved, no error has been suggested.

Requested instruction 11 is drawn from *Hannemann v. Boyson*, 698 N.W.2d 714 (Wis. 2005), an appellate decision of the Supreme Court of Wisconsin.  It has never been cited by the appellate courts of Maryland, any United States District

29

Court in the Fourth Circuit, or by this Court.  Saheta is aware of no Maryland case

with such a holding, and Piehl cited none to the District Court or to this Court on

appeal.  *Hannemann* can hardly be considered a "controlling legal principle" under

Maryland law, and thus there can be no error in failing to give such an instruction.

Indeed, the risk of error would be far greater were the District Court to have gone

out on a limb and so instructed the jury without anything to suggest that this was

actually the applicable law.

  If, somehow, the Court were to find it was error to refuse to give instruction

11, there would be no "serious prejudice" here because the informed consent

instruction actually given certainly does not preclude an argument that the duty to

provide informed consent occurred on more than one occasion during the care of a

patient.  Piehl's argument to the jury during his closing was that Piehl should been

advised of a risk of death due to Amiodarone toxicity at the time he was initially

prescribed the medication and that during his April 30, 2009 he should have been

told the risk of continuing Amiodarone was too great due to a recent pulmonary

concern.  Transcript of April 1, 2014, pages 114-115, 117-118.  Applying the law

regarding informed consent as instructed, a jury could have determined that death

30

due to Amiodarone toxicity was a material risk and that Saheta failed to disclose

this risk[6] when the medication was initially prescribed and/or April 30, 2009.

## **CONCLUSION**

Wherefore, for the foregoing reasons, Appellee prays that this court affirm

the judgment of the United States District Court for the District of Maryland.

Matthew H. Fogelson
Frederick W. Goundry, III
VARNER & GOUNDRY
A Professional Corporation
121 East Patrick Street
Frederick, MD  21701
(301) 631-1800
Attorneys for Appellee,
Narayan P. Saheta, M.D.

---

[6] Saheta testified during trial that he did so inform Piehl.  Transcript of April 1, 2014, pp. 102-104.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 6th day of November, 2014, a copy of the foregoing **Appellees' Brief** was sent via regular mail, postage prepaid to:

Henry L. Belsky, Esquire
Mitchell E. Rosensweig, Esquire
Schlachman, Belsky & Weiner, P.A.
300 E. Lombard Street, Suite 1100
Baltimore, MD 21202



Matthew H. Fogelson

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. <u>14-1387</u>    **Caption:** <u>Paula A. Piehl, et al. v. Saheta</u>

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[✓] this brief contains ____7,741____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[ ] this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[✓] this brief has been prepared in a proportionally spaced typeface using <u>Microsoft Word 2010</u> [*identify word processing program*] in <u>14, Times New Roman</u> [*identify font size and type style*]; **or**

[ ] this brief has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s) _____

Attorney for <u>Appellee</u>

Dated: <u>November 6, 2014</u>

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __14-1387__    Caption: _Paula Piehl, et al. v. Narayan P. Saheta, M.D._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Narayan P. Saheta, M.D._
(name of party/amicus)

who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

10/28/2013 SCC    - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☑YES ☐NO
    If yes, identify entity and nature of interest:

    Medical Mutual Liability Insurance Society of Maryland

5.  Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: _Frederick V. Gorsby III / jo_    Date: ___April 25, 2014___

Counsel for: Narayan P. Saheta, M.D.

## CERTIFICATE OF SERVICE
**************************

I certify that on ___April 25, 2014___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Henry L. Belsky, Esquire
Mitchell E. Rosensweig, Esquire
Schlachman, Belsky & Weiner, P.A.
300 E. Lombard Street, Suite 1100
Baltimore, MD 21202

_Frederick V. Gorsby III / jo_                    ___April 25, 2014___
      (signature)                                          (date)

- 2 -

**Kati Gastley**

| | |
|---|---|
| **From:** | ecfnoticing@ca4.uscourts.gov |
| **Sent:** | Friday, April 25, 2014 12:23 PM |
| **To:** | kgastley@vglaw.org |
| **Subject:** | 14-1387 Paula Piehl v. Narayan P. Saheta, MD "Disclosure of corporate affiliations (LR 26.1)" |

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing.

**United States Court of Appeals for the Fourth Circuit**

**Notice of Docket Activity**

The following transaction was entered on 04/25/2014 at 12:23:19 PM EDT and filed on 04/25/2014

| | |
|---|---|
| **Case Name:** | Paula Piehl v. Narayan P. Saheta, MD |
| **Case Number:** | 14-1387 |
| **Document(s):** | Document(s) |

**Docket Text:**
DISCLOSURE OF CORPORATE AFFILIATIONS (Local Rule 26.1) by Appellee Narayan P. Saheta. Was any question on Disclosure Form answered yes? Yes [999343973] [14-1387] Frederick Goundry

**Notice will be electronically mailed to:**

Mr. Frederick W. Goundry, III: fgoundry@vglaw.org, kgastley@vglaw.org
Mr. Henry Belsky: cgoetz@sbwlaw.com, dgarbers@sbwlaw.com

**Notice will not be electronically mailed to:**

Mitchell Rosensweig
SCHLACHMAN, BELSKY & WEINER, PA
300 East Lombard Street
Baltimore, MD 21202-0000

The following document(s) are associated with this transaction:
**Document Description:** Disclosure of corporate affiliations (LR 26.1)
**Original Filename:** disclosure form.completed.filed copy.pdf
**Electronic Document Stamp:**
[STAMP acecfStamp_ID=1105645354 [Date=04/25/2014] [FileNumber=999343973-0]

1

[26201c05c9504185a2fdb34cdd4eb6c63534b02c359b019a233e229178afa022969f6715b2199de89d2f020ee532
02f16536fbb8e2a2ff40720c823f65bf7c57]]

PERTINIENT AUTHORITY

## Federal Rules of Evidence Rule 611 - Mode and Order of Examining Witnesses and Presenting Evidence

(a) Control by the Court; Purposes. The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to:

      (1) make those procedures effective for determining the truth;

      (2) avoid wasting time; and

      (3) protect witnesses from harassment or undue embarrassment.

(b) Scope of Cross-Examination. Cross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility. The court may allow inquiry into additional matters as if on direct examination.

(c) Leading Questions. Leading questions should not be used on direct examination except as necessary to develop the witness's testimony. Ordinarily, the court should allow leading questions:

      (1) on cross-examination; and

      (2) when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party.

ADDENDUM

*Nguyen v. Arce*, 34 Fed. Appx. 879 (4th Cir. 2002)

34 Fed.Appx. 879
This case was not selected for publication in the
Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also Fourth Circuit Rule 32.1
(Find CTA4 Rule 32.1)
United States Court of Appeals,
Fourth Circuit.

Minh NGUYEN, Plaintiff–Appellant,
and
Wing Hung Yeung, Plaintiff,
v.
Armando ARCE; Milton C. Clark; B.G. Morrisey,
Incorporated; H & M International, Incorporated,
Defendants–Appellees.
Wing Hung Yeung, Plaintiff–Appellant,
and
Minh Nguyen, Plaintiff,
v.
Armando Arce; Milton C. Clark; B.G. Morrissey,
Incorporated; H & M International, Incorporated,
Defendants–Appellees.

Nos. 00–1672, 00–1693. | Argued Jan. 24, 2002. |
Decided April 25, 2002.

Plaintiffs, who were injured when their car stopped
working while on the interstate and tractor-trailers ran
into the car, brought negligence suits against drivers and
owners of the tractor-trailers, and defendants filed
third-party complaints and asserted contributory
negligence claims. The United States District Court for
the District of Maryland, Peter J. Messitte, J., entered
judgment on jury verdict in favor of defendants, and
plaintiffs appealed. The Court of Appeals held that: (1)
even if it was error to give jury instruction that set forth
an allegedly inappropriately low standard of care
regarding the legal duties of owners and operators of
commercial motor carriers to inspect and maintain their
brake systems, error was not prejudicial to plaintiffs; (2)
any error in failing to strike statements made by
defendant's counsel during closing argument concerning
plaintiff's contributory negligence and failure to call as a
witness plaintiff's son, who was car mechanic who
allegedly inspected plaintiff's car, was harmless; and (3)
defendant's explanation that reason for striking Asian
juror from case that involved car accident was that juror
was young and thus was relatively inexperienced in
driving was a legitimate race-neutral factor.

Affirmed.

West Headnotes (4)

[1]    **Federal Courts**
       👈Applicability to issues and evidence

Even if it was error to give jury instruction that
set forth an allegedly inappropriately low
standard of care regarding the legal duties of
owners and operators of commercial motor
carriers to inspect and maintain their brake
systems, error was not prejudicial to appellants,
and thus, new trial would not be ordered, where
appellants did not object to the instruction, and
federal regulations that mandated the higher
standard of care requiring pre-trip inspections
were read to the jury, and the uncontroverted
evidence established that pre-trip inspection of
tractor-trailer at issue was performed.

Cases that cite this headnote

[2]    **Federal Courts**
       👈Argument and conduct of counsel

Any error in failing to strike statements made by
counsel for defendant-truck driver during
closing argument concerning plaintiff's
contributory negligence and failure to call as a
witness plaintiff's son, who was car mechanic
who allegedly inspected plaintiff's car, was
harmless, where even assuming that the
statements during closing were improper,
plaintiff was not prejudiced because plaintiff's
negligence was not an issue the jury was
instructed to decide, and jurors were presumed
to follow the law.

Cases that cite this headnote

Nguyen v. Arce, 34 Fed.Appx. 879 (2002)

[3]    **Evidence**
👉Re-examination

Trial court did not err in denying plaintiff's counsel the opportunity to perform a second cross-examination of defendant's accident reconstruction expert after expert allegedly testified during defendant's "friendly cross" new subjects that were not addressed in the previous examination by any party, where it was plaintiff's counsel, on cross-examination of expert who asked whether defendant should have been able to see plaintiff's car in front of him, which opened the door for defendant's counsel, on "friendly cross," to ask questions pertaining to whether defendant would have been able to perceive that plaintiff's car was stopped.

Cases that cite this headnote

[4]    **Jury**
👉Peremptory challenges

Defendant's explanation that reason for striking Asian juror from case that involved car accident was that juror was young and thus was presumably relatively inexperienced in driving was a legitimate race-neutral factor on which counsel could rely when striking a potential juror, even though defendant did not question jurors directly about their driving experience.

Cases that cite this headnote

**\*880** Appeals from the United States District Court for the District of Maryland, at Greenbelt. Peter J. Messitte, District Judge. (CA–96–3728–PJM, CA–98–9–PJM).

**Attorneys and Law Firms**

**ARGUED:** Salvatore Joseph Zambri, Regan, Halperin & Long, P.L.L.C., Washington, D.C., for Appellants. Robert Lawrence Ferguson, Jr., Ferguson, Schetelich & Heffernan, P.A., Baltimore, Maryland; Richard Scott Schrager, Armstrong, Donohue & Ceppos & Vaughan, Rockville, Maryland, for Appellees. **ON BRIEF:** Patrick

M. Regan, Regan, Halperin & Long, P.L.L.C., Washington, D.C.; V. Peter Markuski, Jr., Wilson, Goozman, Bernstein & Markuski, Laurel, Maryland, for Appellants.

Before MOTZ, KING, and GREGORY, Circuit Judges.

Affirmed by unpublished PER CURIAM opinion.

## OPINION

PER CURIAM.

After a jury verdict in favor of defendants on all counts in a negligence action stemming from a motor vehicle accident, appellants asked for a new trial based on several rulings by the trial judge they found to be objectionable. The district court denied the motion. For the reasons set forth below, we find no reversible error.

### I.

On April 2, 1996, appellants Minh Nguyen and Wing Hung Yeung were traveling southbound on Interstate 95 in Delaware in Nguyen's late model Mercedes sedan. Appellants were returning to Maryland **\*881** from Atlantic City, New Jersey.[1] Yeung was driving in the left center lane of the four lane highway when the Mercedes suddenly lost all power. The accelerator was not responsive and Yeung could not maneuver the vehicle to either shoulder. The vehicle came to a stop in the lane.

[1]    Nguyen had been in Atlantic City with some friends over the weekend. She became separated from her friends and was without a means to return to her Maryland home. Nguyen called Yeung and he agreed to drive her car to Atlantic City. Because Nguyen was tired on the morning of the accident, Yeung also agreed to drive back to Maryland. Nguyen was asleep in the back seat when her Mercedes lost power.

Two tractor-trailers were traveling behind Yeung and Nguyen on the interstate. The first tractor-trailer was driven by Armando Arce in the course and scope of his employment with H & M International (H & M). Milton Clark was operating the second trailer in the course and scope of his employment with B.G. Morrissey

(Morrissey). While stopped in the lane, the Mercedes was struck first by the tractor-trailer driven by Arce and then by the tractor-trailer driven by Clark. Both appellants were injured in the accident, Nguyen seriously so.

Nguyen and Yeung separately filed suits against Arce, H & M, Clark and Morrissey for injuries sustained by them as a result of the accident. Jurisdiction was based on diversity of citizenship. All defendants claimed the accident was unavoidable, and all claimed Nguyen was contributorily negligent for her failure to adequately maintain and inspect the Mercedes. Defendants also filed third party complaints against Yeung, asserting that his negligence was the proximate cause of the accident and that he was acting as Nguyen's agent when he drove to and from Atlantic City in her vehicle.

The cases were consolidated, and a jury trial commenced on March 7, 2000 in the United States District Court for the Southern Division of Maryland. Because the case had previously been bifurcated, liability was the only issue presented to the jury. The jury found in favor of defendants on all counts and in favor of Yeung on defendants' third party complaints. A final order of judgment was entered on March 17, 2000. Appellants filed a motion for a new trial based on four perceived errors at trial. The trial court denied the motion on April 26, 2000, and appellants timely noted their appeal.

## II.

Nguyen and Yeung assert that the district court erred in four different respects at trial. They contend that they were prejudiced by an erroneous jury instruction, improper arguments made in closing, and the district court's failure to allow a "second cross-examination" of an expert witness. Appellants also assert that the district court improperly overruled their *Batson* challenge to one defendant's use of a peremptory strike. Having considered the record, the briefs, and the applicable law, and having had the benefit of oral argument on these issues, we affirm the district court's denial of the motion for new trial.

## A.

[1] Appellants first contend that the district court committed reversible error in giving Maryland Pattern Jury Instruction 18:7.1 because the instruction sets forth

an inappropriately low standard of care regarding the legal duties of appellees, as owners and operators of commercial motor carriers, to inspect and maintain their brake systems.[2] Even assuming appellants **\*882** are correct in asserting that the instruction did not comply with the standard set forth in the Federal Motor Carrier Safety Regulations, we decline to order a new trial because, based on the record as a whole, the alleged error was not prejudicial to appellants.

[2]    We note that Instruction 18:7.1 was submitted to the court before trial as part of plaintiffs' requested jury instructions.

Because the tractor-trailers driven by Arce and Clark were commercial motor vehicles that transport property in interstate commerce, all parties agree that the Federal Motor Carrier Safety Regulations are applicable in this case.[3] *See* 49 C.F.R. §§ 390–396. The federal regulations require that a driver "be satisfied" the vehicle is in safe operating condition *before* driving the vehicle. *See* 49 C.F.R. § 396.13 and 392.7.[4]

[3]    At trial, it was established that the brakes on the tractor driven by Clark for Morrissey were out of adjustment.

[4]    The federal regulations were provided as evidence of the applicable standard of care and as part of the proposition that a violation of a regulation may be evidence of negligence, not negligence *per se*.

Maryland Pattern Jury Instruction 18:7.1 states that an operator's duty to inspect a vehicle for defective brakes may be accomplished by "operating the brakes and finding them in adequate working condition prior to the failure, provided that the operator did not have reasons to suspect the brakes may be likely to fail in the course of the normal operation of the vehicle." Appellants argue that this instruction conflicts with Federal Motor Carrier Safety Regulations because it does not require a *pre-trip* inspection of the vehicle. However, even if we assume it was error to give the Maryland form instruction, a jury charge "must be construed in light of the whole record." *Abraham v. County of Greenville*, 237 F.3d 386, 393 (4th Cir.2001) (citing *Spell v. McDaniel*, 824 F.2d 1380, 1395 (4th Cir.1987)). A judgment will be reversed for error in jury instructions "only if the error is determined to have been prejudicial, based on a review of the record as a whole." *Id.* (quoting *Wellington v. Daniels*, 717 F.2d 932, 938 (4th Cir.1983)). We have examined the record in

Nguyen v. Arce, 34 Fed.Appx. 879 (2002)

detail, and we find that the instruction complained of did not cause any discernable prejudice to appellants.

To begin, appellants did not object to Maryland Pattern Jury Instruction 18:6, which was read to the jury along with Instruction 18:7.1. Instruction 18:6 states that a "defective condition which is the cause of the accident is evidence of negligence of an operator and owner who has failed to properly maintain and inspect the vehicle." Like Instruction 18:7.1, Instruction 18:6 reads in part that "[p]roper inspection means an inspection which shows that the vehicle or the alleged defective part of the vehicle was *in adequate working condition prior to the failure.*"[5] (emphasis added). Even if Instruction 18:7.1 had not been read to the jury, the same language, though in broader terms (defective part versus brakes specifically) would have reached the jury because no objections were made to Instruction 18:6. In addition to the fact that appellants did not object to Instruction 18:6, we also note that the federal regulations, all mandating a pre-trip inspection, were read to the jury.

[5]    Instruction 18:7.1 states that "the duty of an operator to inspect the brakes may be accomplished by operating the brakes and finding them *in adequate working condition prior to the failure,* provided that the operator did not have reason to suspect that the brakes may be likely to fail in the course of the normal operation of the vehicle. (emphasis added).

Furthermore, the uncontroverted evidence presented at trial established that Clark did in fact perform a 20 to 25 minute *883 pre-trip inspection on his tractor.[6] J.A. 558. While Clark's testimony did not establish that he inspected the trailer he was transporting at the time of the accident, there is no evidence before us that the trailer's brakes were faulty, and there is no evidence that inspecting the trailer's brakes would have revealed the defect in the tractor's brakes. Thus, taken as a whole, we find no prejudice stemming from the district court's decision to give Maryland Pattern Jury Instruction 18:7.1.

[6]    While the federal regulations mandate that inspections take place *before* the vehicle is driven, they do not detail *how* an adequate pre-trip inspection is accomplished.

## B.

[2] Second, appellants argue that the trial court committed

reversible error when it failed to strike statements made by counsel for Arce and H & M in closing argument concerning Nguyen's contributory negligence and appellants' failure to call Nguyen's son as a witness. We find that any error in failing to strike the statements was harmless, but in order to explain our finding, some elaboration on the facts is necessary.

At trial, Nguyen testified that before she bought the Mercedes, she asked her son, a mechanic, to look it over. He allegedly determined that the Mercedes did not have mechanical problems. Prior to submitting the case to the jury, the issue of Nguyen's contributory negligence was removed from the case for lack of evidence. However, appellant Yeung's negligence remained as part of the third party complaint brought by defendants. Defendants urged the jury to find that Yeung was Nguyen's agent. If the jury found Yeung was both negligent and Nguyen's agent, his negligence could have been imputed to her.

In closing argument, counsel for Arce asked "Where is [Nguyen's] son, the mechanic, to tell you the condition of that car the week before this accident when she decided she was going to buy it ... ?" Nguyen's counsel objected, but the district court overruled the objection. On appeal, appellants claim this was improper argument because the issue of Nguyen's contributory negligence was out of the case. They assert that counsel for Arce intentionally interjected Nguyen's contributory negligence back into the case when he asked about her son in closing.

Even assuming that the statements made in closing argument were improper, we find that they did not prejudice appellants. Even if counsel for Arce and H & M intentionally interjected Nguyen's contributory negligence back into the case, we see no way Nguyen would have been prejudiced because her negligence was not an issue the jury was instructed to decide. In addition to Yeung's contributory negligence[7], the only issue for the jury to decide was that of *defendants'* negligence. Jurors are presumed to follow the law, *see Brinkley–Obu v. Hughes Training, Inc.,* 36 F.3d 336, 354 (4th Cir.1994), and we see nothing in the record to suggest that they did not do just that here. It would be mere speculation for us to find that the jury imputed some sort of contributory negligence on the part of Nguyen into its finding that the defendants were not negligent.

[7]    Certainly the statements did not prejudice Yeung, as the jury found that he was not contributorily negligent in his operation of the vehicle.

Appellants further assert that the court compounded the

error by failing to issue a curative instruction explaining that no inference could be drawn from the fact that Nguyen's son did not testify. We find no abuse of discretion here. Nguyen's counsel **884 explained in his rebuttal argument that Nguyen's son was available to either party because defendants could have subpoenaed him. Furthermore, the court instructed the jury that closing arguments by counsel are not to be considered evidence in the case.

### C.

Third, appellants claim that the trial court erred in denying Nguyen's counsel the opportunity to perform a second cross-examination of Clark and Morrissey's accident reconstruction expert. At trial, counsel for Clark and Morrissey called defense expert Wayne S. Gosnell to offer his opinion about Clark's actions and the capabilities of the Morrissey tractor-trailer driven by Clark. Nguyen's counsel then cross-examined the expert. After the cross-examination, counsel for co-defendants Arce and H & M was allowed to question the expert. Appellants claim that during this "friendly cross," the expert testified about new subjects and gave new opinions that were not addressed in the previous examination by any party. After a careful review of the record, we find that this argument is without merit.

[3] Appellants claim that crucial expert testimony went unchallenged here because counsel for Arce and H & M, in asking about Arce's actions, went beyond the scope of previous examination, which had only related to Clark's actions.[8] The fault with this argument lies in the fact that Nguyen's counsel, on cross-examination of Mr. Gosnell, asked the expert, "Should Mr. Arce have been able to see the Mercedes over the white car in front of him?" J.A. 899. This opened the door for Arce's counsel, on "friendly cross," to ask questions pertaining to whether Arce would have been able to perceive that the Mercedes was stopped.[9]

---

[8]    Nguyen's counsel *never* objected during Gosnell's testimony that the questioning by counsel for Arce was beyond the scope of direct or of cross-examination.

[9]    The other testimony claimed by appellants to be new material was both cumulative and irrelevant, and any error in admitting it was harmless.

In addition, the litigants were well aware of the order of examination, and were on notice that the district court would not permit second examinations of witnesses, expert or otherwise. The district court had established a protocol at the beginning of trial and the parties agreed to that protocol. For these reasons, we find that the court did not abuse its discretion in denying Nguyen's counsel's request to "re-cross" Gosnell.

### D.

[4] Finally, appellants contend that the trial court erred in accepting Arce and H & M's explanation for their peremptory strike of juror number 3, Thinh D. Tran. Appellants challenged the strike pursuant to *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), alleging that juror Tran was struck because of his "Asian heritage."[10] In response to the challenge, counsel for Arce and H & M explained that his purpose "was to strike the youngest jurors for inexperience in driving." Tran, age 25, was one of the youngest jurors in the pool. The district court, assuming a prima facie case of discrimination, found the explanation "justifiable" and overruled the *Batson* challenge.

[10]    Juror Tran and appellant Nguyen are both Vietnamese. Appellant Yeung is from China.

Trial court findings concerning whether peremptory challenges are made for racially discriminatory reasons are given great deference by this court. **885 *United States v. Grimmond,* 137 F.3d 823, 833 (4th Cir.1998) (quoting *Jones v. Plaster,* 57 F.3d 417, 421 (4th Cir.1995)). As such, we review a district court's *Batson* finding only for clear error. *Id.* Here, we find no such error.

We have held that age is a legitimate race-neutral factor on which counsel may rely when striking a potential juror. *See Howard v. Moore,* 131 F.3d 399, 408 (4th Cir.1997) (en banc). Because counsel for Arce and H & M articulated a race-neutral explanation for the challenge, the burden then shifted to appellants to prove that the explanation was a pretext for discrimination. *Id.* at 407; *Batson,* 476 U.S. at 98.

Appellants attempted to meet this burden by arguing that a juror who was younger than Tran was not stricken. A discussion ensued, where counsel for Arce and H & M explained that he did not strike the younger juror because

counsel for co-defendants had already stricken that juror. The district court found no discriminatory purpose. Appellants now argue on appeal that we should find evidence of discriminatory purpose because counsel for Arce and H & M did not question jurors about their driving experience, and juror Tran could have had more driving experience than an individual on the panel who was twice his age. We find this argument unpersuasive. It is certainly not unreasonable to infer a lack of driving experience from one's young age. Appellants simply have not shown that the explanation offered by counsel for Arce and H & M was a pretext for discrimination.

### III.

Based on the foregoing, we affirm the district court's decision denying the motion for a new trial.

*AFFIRMED.*

### Parallel Citations

2002 WL 726663 (C.A.4 (Md.))

---

**End of Document**                                                              © 2014 Thomson Reuters. No claim to original U.S. Government Works.